**ROCKWELL INTERNATIONAL SYSTEMS, INC.,**
**Plaintiff-Appellee-Cross-Appellant,**

v.

**CITIBANK, N.A. and Bank Tejarat,**
**Defendants-Appellants-Cross-Appellees.**

**Nos. 1352, 1549, 1629, 1603, 1550, Dockets 82–7864, 82–7866, 83–7216, 83–7228 and 83–7256.**

United States Court of Appeals, Second Circuit.

Argued June 16, 1983.

Decided Oct. 11, 1983.

Lawrence W. Newman, Baker & McKenzie, New York City (James G. Barnes, Robert B. Cartwright, Jean Bernstein, John J. Conroy, Jr., New York City, of counsel), for plaintiff-appellee-cross-appellant.

Mark P. Zimmett, Shearman & Sterling, New York City (Henry Harfield, John E. Hoffman, Jr., Rosalie Lawlor, Daniel Levin, New York City, of counsel), for defendant-appellant-cross-appellee Citibank, N.A.

Alan R. Friedman, Kramer, Levin, Nessen, Kamin & Frankel, New York City (Daniel P. Levitt, Greg A. Danilow, New York City, of counsel), for defendant-appellant-cross-appellee Bank Tejarat.

Before FRIENDLY, OAKES and CARDAMONE, Circuit Judges.

OAKES, Circuit Judge:

Citibank, N.A. (Citibank), and Bank Tejarat (Tejarat) appeal from an order granting a preliminary injunction issued by the United States District Court for the Southern District of New York, Vincent L. Broderick, Judge, on October 15, 1982, and from a second order, entered by Judge Broderick on March 1, 1983, denying appellants' motion to vacate the prior order. The October 15 order enjoined Tejarat from making, and Citibank from honoring, demands under two letters of credit issued by Citibank in favor of Tejarat to secure the performance of plaintiff Rockwell International Systems, Inc. (Rockwell), under a contract between Rockwell and the Ministry of War of the Imperial Government of Iran. The gist of Rockwell's case is that, as a result of the revolution in Iran and its aftermath, it was prevented by the new government in Iran from completing performance of the contract and that the subsequent calls by Iranian officials at Tejarat on the letters of credit were fraudulent. Judge Broderick denied the defendant-appellants' motion to vacate a temporary restraining order that had remained in effect by consent[1] of the parties since May 5, 1980, and, after finding that Rockwell's showing satisfied the requirements of probable success on the merits and irreparable harm, granted the preliminary injunction. Tejarat and Citibank appeal; Rockwell cross-appeals that portion of Judge Broderick's order requiring it to indemnify Citibank against any damages resulting from the injunction. We affirm.

*Background*

In September of 1977 Rockwell entered into Contract 120 (the contract) with the Ministry of War of the Imperial Government of Iran. Under the contract Rockwell was to provide engineering and advisory services and material in connection with the establishment of a communications system in Iran. Article 7.1 of the contract required that Rockwell

> submit to the [Ministry of War] one or several Bank Guarantee[s] issued by one of the Iranian Bank[s] accepted by the [Ministry], which [sic] the total amount of them to be equal to 10% of the total amount of the Contract ... for the correct performance of the Contract....

Accordingly Tejarat's prerevolutionary predecessor, Iranians' Bank, issued two guarantees totalling $2,364,782 in favor of the Imperial Government to secure Rockwell's performance. These guarantees were in turn backed up by two letters of credit in favor of Iranians' Bank issued by Citibank at Rockwell's behest, thus establishing the four-corner arrangement customary in international transactions of this sort, involving what are commonly referred to as "standby letters of credit." *See* Getz, En-

---

1. Citibank now disputes that it ever consented to the continuation of the temporary restraining order. Citibank Br. at 11 n. **.

joining the International Standby Letter of Credit: The Iranian Letter of Credit Cases, 21 Harv.Int'l L.J. 189, 198–200 (1980).

The events surrounding the Shah's fall and the seizure of the American Embassy in Iran need not be recounted here; suffice it to say that Rockwell, in a letter dated February 1, 1979, invoked the *force majeure* clause of Contract 120, demanded an extension of completion time and offered to "discuss th[e] matter . . . by telephone . . . or . . . in Iran, as soon as circumstances permit." A meeting between Rockwell representatives and the Ministry of War, now called the Ministry of Defense, took place in Tehran on September 22, 1979, at which time Rockwell proposed that it be paid $3,159,400 for work to date and that the contract be terminated. This proposal was rejected, but neither Tejarat nor Citibank dispute Rockwell's contention that the Iranian representatives at the meeting "made it clear that they expected no further performance from [Rockwell] pending further negotiations, the termination of Contract 120, and the execution of new contracts." Although Rockwell arguably could have cancelled the contract, thus securing release of the letters of credit,[2] it instead indicated its willingness to complete performance.

By November of 1979 relations between Iran and the United States had become hostile; in response to the embassy seizure, President Carter froze all Iranian assets on November 14, 1979. Diplomatic relations with Iran were severed on April 7, 1980, and the Iranian Assets Control Regulations, 31 C.F.R. §§ 535.101–535.904 (1982), were broadened so as to prohibit virtually all transactions between Iranian and American nationals. On April 25, 1980, Rockwell was informed by Citibank that it had, on March 31 and April 22, received Tejarat's demands for payments under the letters of credit.[3] Rockwell immediately filed suit, and on May 5, 1980, obtained a temporary restraining order preventing Citibank from honoring the demands.

*Discussion*

As a threshold matter we emphasize that we deal here only with the propriety of interim, i.e., preliminary, injunctive relief. Judge Broderick's order did not permanently enjoin Citibank from paying Tejarat's demands under the letters of credit and, except to the extent necessary to review the finding of probability of success on the merits, we do not address the merits of the issues involved in the contractual dispute or the continued validity of the letters of credit.

■ We reject at the outset Tejarat's argument that, by virtue of the January 19,

---

**2.** Article 6.2 of Contract 120 provides, in relevant part:

In the event of Force Majeure when the performance of this Contract becomes impossible, the afflicted party must inform in writing to the other party of the occurence [sic] of the said event or events, and also mention in his letter the estimated duration of time during which these circumstances will continue.

Then, both parties of this Contract must consult and exchange views with each other to find ways to deal with such events.

However, if within three (3) months from the date of requesting for negotiations by either party, a mutually agreeable solution is not found, each party can, on his opinion, cancel the Contract by giving a written notice to the other party.

While it did not provide the Iranian government with a written notice of cancellation, Rockwell insists that the contract was terminated by virtue of prolonged *force majeure*. See Rockwell's Statement of Claim before Iran-

United States Claims Tribunal, A–427, 429. Article 7.4 of Contract 120 states expressly that [i]n the event the Contract is cancelled due to Force Majeure or the Employer cancels the Contract for any reason except the Contractor's negligence, all Bank Guarantees of good performance of work will be released. If, therefore, Contract 120 was terminated, the bank guarantees would have been released, and no legitimate call could have been made under the letters of credit. Judge Broderick's October 15, 1982, order found that Contract 120 had, in fact, been cancelled, and thus that the subsequent calls were illegitimate. As noted below, our affirmance of Judge Broderick's order is based on our conclusion that Rockwell has demonstrated sufficient probability of success on the merits, although not necessarily on the grounds that the guarantees were released when work under the contract stopped.

**3.** The earlier demands were construed by Citibank as not conforming to the requirements of the letters of credit and were rejected.

1981, "Hostage Agreement"[4] establishing the Iran-United States Claim Tribunal (Tribunal), United States courts lack jurisdiction to grant preliminary injunctive relief. The Assets Control Regulations promulgated by the Executive Branch to implement the Tribunal Agreement prohibit only a "final judicial judgment or order (A) permanently enjoining, (B) terminating or nullifying, or (C) otherwise permanently disposing of any interest of Iran in any standby letter of credit. . . ." 31 C.F.R. § 535.504(b)(3)(i) (1983). As the "supplementary information" accompanying this regulation makes clear, the purpose of the regulation "is to preserve the status quo by continuing to allow U.S. account parties to obtain preliminary injunctions or other temporary relief to prevent payment on standby letters of credit. . . ." 47 Fed.Reg. 29,529 (1982). Although Iran is currently challenging the validity of this regulation before the Tribunal at least until such time as that body rules, precedent, *see, e.g., Kolovrat v. Oregon,* 366 U.S. 187, 194–95, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961), as well as prudence, counsel deference to the Executive's view that preliminary injunctive relief is not inconsistent with the agreement establishing the Tribunal.

Having determined that the district court had the authority to grant the preliminary injunction, we next address whether it properly did so in this case. In this circuit a movant must make a "showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly" in its favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). We turn first to the question of irreparable harm.

*1. Irreparable Harm*

■ Tejarat and Citibank argue that Rockwell has failed to show that in the absence of an injunction it would suffer irreparable harm because it could seek recovery either in a claim filed with the Tribunal or in a suit filed wherever Iran has assets subject to attachment. The defendants also argue that the plaintiff is not entitled to injunctive relief since "[a]ll that Rockwell has at stake is money," Citibank Br. at 18, and the availability of a remedy at law precludes a finding of irreparable injury. Although it is true that Rockwell, as the moving party, bears the burden of proving irreparable injury, *see, e.g., Robert W. Stark, Jr. Inc. v. New York Stock Exchange, Inc.,* 466 F.2d 743, 744 (2d Cir.1972) (per curiam), we do not think it is necessary for Rockwell to show that without an injunction "rigor mortis [would] set in forthwith." *Studebaker Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir.1966). We note, for example, that a remedy at law may be considered inadequate when the amount of damages would be difficult to prove, *see, e.g., Phillips v. Crown Central Petroleum Corp.,* 602 F.2d 616, 630 (4th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980); *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 218 (9th Cir.), *cert. denied,* 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974), and it would thus seem, a fortiori, that the same conclusion follows when the very availability of a forum is called into question. Our assessment of irreparable harm in the context of this action thus necessitates an inquiry into whether Rockwell does indeed enjoy the prospect of a real, rather than merely speculative or illusory, opportunity to press its claims elsewhere.

Judge Broderick's decision to grant the preliminary injunction was based largely on

---

4. The agreement actually comprises two separate declarations, the "Declaration of the Government of the Democratic and Popular Republic of Algeria," U.S. Dept. of State *Bulletin,* Vol. 81, Issue 2047 (Feb.1981) (S–100) [hereinafter "Declaration I"] and the "Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran," U.S. Dept. of State *Bulletin,* Vol. 81, Issue 2047 (Feb.1981) (S–102) [hereinafter "Declaration II"].

his finding that it was "highly probable that the Hague Tribunal will refuse to accept jurisdiction over plaintiff's claims," a finding based on the fact that the agreement establishing the Tribunal expressly excludes from its jurisdiction claims under contracts—such as Rockwell's—that provide for resolution of disputes in Iranian courts.[5] In response to this jurisdictional point, the appellants now point to *Ford Aerospace & Communications Corp. v. Air Force of the Islamic Republic of Iran* (Case No. 159) (Iran-United States Claims Tribunal, Nov. 5, 1982), *reprinted in* Iranian Assets Lit. Rep., Nov. 19, 1982 at 5,620, a Tribunal ruling handed down after Judge Broderick's first ruling. *Ford Aerospace* held that a forum selection clause almost identical to the one in Rockwell's contract did not divest the Tribunal of jurisdiction,[6] and the defendants thus argue that the "linchpin to the District Court's opinion ... has been removed." Tejarat Br. at 12. We disagree. The *Ford Aerospace* ruling is relevant only to Rockwell's claim against the Ministry of Defense for work performed under the underlying contract; the case does not speak to the Tribunal's jurisdiction over the secondary contracts—i.e., the letters of credit—securing the underlying contract. The letters of credit represent separate contractual undertakings that are, in legal contemplation, wholly distinct from whatever performance they ultimately secure. This is not merely an analytic nicety; the "independence" principle is an example of legal form following commercial function, and it is recognized in domestic as well as international law. *See* Getz, *supra,* at 203–04 and sources cited therein. Thus, although it does seem likely that the Tribunal has jurisdiction over Rockwell's claim under the underlying contract, it is far from clear that it has jurisdiction over Rockwell's claims

against the defendants here, particularly those involving Citibank. *Cf. Harza Engineering Co. v. The Islamic Republic of Iran* (Case No. 98) (Iran-United States Claims Tribunal, Dec. 3, 1982), at 12–13, *reprinted in* Iranian Assets Lit. Rep., Jan. 21, 1983 at 5,952 (dismissing Iranian bank's counterclaim demanding payment under letters of credit because counterclaim was unrelated to claim that bank wrongfully blocked plaintiff's account, noting in dictum that "[a] letter of credit is a financial instrument embodying obligations which are autonomous and independent of the transaction to which it is a condition"). The regulation discussed above, 31 C.F.R. § 535.504(b)(3)(i), reinforces our conclusion that the question of the Tribunal's jurisdiction is at best sufficiently unsettled, such that relief limited to preservation of the status quo by means of a preliminary injunction is justified. In sum, we agree with the Eleventh Circuit's conclusion in *Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344, 1357 (11th Cir.1982), that "possible resort to the Iran-United States Claims Tribunal does not, in our eyes, ameliorate the likelihood of irreparable injury."

The availability of relief in other forums to which Rockwell might turn is even more problematic. Again, the forum selection clause in Rockwell's contract on its face compels resort to Iranian courts, and we need not take issue with the *Ford Aerospace* ruling to note that it is possible, perhaps even probable, that other jurisdictions would reach a conclusion contrary to the Tribunal's, and decline to exercise jurisdiction. Neither Tejarat nor Citibank argues that the post-revolutionary Iranian judicial system is capable of affording an adequate remedy; courts that have passed on this

---

**5.** Declaration II, Article 11 at § 1.

Article 8 of Contract 120 provides that:
All differences and disputes which may arise between the two parties resulting from interpretation of the Articles of the Contract or the execution of the works which can not be settled in a friendly way, must be settled in accordance with the rules and laws of Iran via referring to the competent Iranian Courts.

**6.** The Tribunal construed Declaration II to provide for jurisdiction in cases where a forum selection clause did not cover "any," i.e., all, disputes that might arise. The forum selection clause in *Ford Aerospace,* case No. 159 at 4, for all intents and purposes identical to the clause quoted above, was viewed as "limited to disputes arising from the interpretation of the contract and the execution of the works."

contention have consistently rejected it. *See, e.g., Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344, 1356–57 (11th Cir.1982); *Itek Corp. v. First National Bank of Boston,* 511 F.Supp. 1341, 1349 (D.Mass.1981), *vacated and remanded on other grounds,* 704 F.2d 1 (1st Cir.1983); *American International Group, Inc. v. Islamic Republic of Iran,* 493 F.Supp. 522, 525 (D.D.C.1980); *Stromberg-Carlson Corp. v. Bank Melli Iran,* 467 F.Supp. 530, 532 n. 3 (S.D.N.Y.1979).

We have little difficulty in distinguishing this case from our decision in *KMW International v. Chase Manhattan Bank, N.A.,* 606 F.2d 10 (2d Cir.1979), a case in which we held preliminary injunctive relief inappropriate. In *KMW* the relief requested was essentially declaratory; no demands had been made on the letters of credit and any future damage was, at that time, "purely conjectural." *Id.* at 15. In the instant case, demands have, of course, been made, and the prospect of injury is immediate. It is also worth noting that, despite our holding in *KMW* that allegations regarding the then "unsettled situation in Iran" were insufficient to justify an injunction, we were willing to grant "a more limited form of relief," in the form of a notice requirement which would allow the plaintiff "to provide evidence of fraud or to take such .other action" as might be appropriate in the event of a call. *Id.* at 16–17. Again, the posture of this case, arising as it does in the context of a wholesale series of calls on similar letters in other Iranian transactions,[7] leaves us with little doubt as to the certainty of injury and, therefore, the need for injunctive relief.

Finally, we see no merit in Tejarat's contention that Rockwell would suffer no injury because Citibank's payments under the letters would initially be made into a "blocked" account pursuant to current regulations. 31 C.F.R. § 535.508 (1982). These accounts are "blocked" in both directions, and their disposition is largely, if not entirely, a matter of Executive prerogative. Since the irreparability of Rockwell's injury is measured, at least in part, by its ability to recoup payments made under the letters, we see little distinction between paying Tejarat directly and paying into blocked accounts. If we accept Tejarat's claim that Rockwell has little to lose if payments are made into such accounts we must at the same time conclude that Tejarat has little to gain and accordingly resolve doubt on this score in favor of preserving the status quo.

### 2. Success on the Merits

The letters of credit issued here were by their very terms subject to the Uniform Customs and Practice for Documentary Credits (UCP). Although the UCP does not explicitly provide for a "fraud in the transaction" defense, New York law—the defendants have not argued that New York law is inapplicable or directed us to any Iranian law on this point—recognizes the availability of this defense under the UCP. *See KMW International v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 15 n. 3 (2d Cir.1979) (citing *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 258 n. 2, 392 N.Y.S.2d 265, 269 n. 2, 360 N.E.2d 943, 947 n. 2 (1976)).

The "fraud in the transaction" defense marks the limit of the generally accepted principle that a letter of credit is independent of whatever obligation it secures. No bright line separates the rule from the exception, to be sure, but we agree with Rockwell that "fraud" embraces more than mere forgery of documents supporting a call. *Cf. United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d at 260 & n. 5, 392 N.Y.S.2d at 271 & n. 5, 360 N.E.2d at 949 &

---

**7.** In a memorial filed with the Iran-United States Claim Tribunal on April 18, 1983, the United States noted that Iran had outstanding 230 claims based on standby letters of credit and similar undertakings issued by United States banks. *Bank Mellat v. Manufacturers Hanover Trust Co.* (Case No. 582) (Iran-United States Claims Tribunal), Memorial of the United States Concerning the Tribunal's Jurisdiction over Iran's Standby Letter of Credit Claims (filed Apr. 18, 1983), at 1 n. 1. Of course, there may have been even more calls made than claims filed.

n. 5 ("fraud in a required document" rejected in favor of "fraud in the transaction" by drafters of U.C.C. § 5–114(2)). The logic of the fraud exception necessarily entails looking beyond supporting documents, and this renders Tejarat's argument that the letters provide for unconditional payment unpersuasive, if not irrelevant. In this case, as in the leading case of *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941), we must look to the circumstances surrounding the transaction and the call to determine whether Tejarat's call amounted to an "outright fraudulent practice." *United Bank Ltd.,* 41 N.Y.2d at 261, 392 N.Y.S.2d at 271, 360 N.E.2d at 949.

In *Sztejn* and *United Bank Ltd.,* sellers called letters of credit after shipping goods—in the *Sztejn* case, garbage—that were clearly non-conforming, thus frustrating completion of the contract by non-performance. In the present case, the Iranian Ministry of Defense is in the position of a "buyer" and it has, for its own reasons, frustrated completion of the contract by suspending Rockwell's performance. We think that the essence of the fraud exception is that "the principle of the independence of [a] bank's obligation under the letter of credit should not be extended to protect" a party that behaves so as to prevent performance of the underlying obligation, *Sztejn,* 177 Misc. at 722, 31 N.Y.S.2d at 634; the "fraud" inheres in first causing the default and then attempting to reap the benefit of the guarantee. *See Dynamics Corp. of America v. Citizens & Southern National Savings Bank,* 356 F.Supp. 991, 999 (N.D.Ga.1973) (finding fraud and enjoining payment in order to prevent foreign sovereign from taking "advantage of [an unsettled political] situation and run off with [the] plaintiff's money on a *pro forma* declaration which has absolutely no basis in fact"). On this view of the fraud exception it is not necessary for Rockwell to demonstrate that either Tejarat or the Ministry of Defense acted deceitfully or with malicious intent. *Cf. SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 193, 84 S.Ct. 275, 283, 11 L.Ed.2d 237 (1963) (law of "fraud

has not remained static .... It has varied ... with the nature of the relief sought, the relationship between the parties, and the merchandise in issue. It is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for monetary damages.").

In deciding that Rockwell will probably be able to demonstrate that the call in this particular case was fraudulent we are necessarily influenced by the fact that this demand is not an isolated occurrence. While we may agree in principle with Tejarat's contention that the economic or political motivations of a letter of credit beneficiary are irrelevant, as a practical matter the fact that calls have been issued wholesale tends to support Rockwell's contention that these letters—issued to secure its "good performance"—were called for reasons entirely unrelated to that performance and were therefore fraudulent. Accordingly, we agree with Judge Broderick's conclusion that there is sufficient probability of success on the merits of the fraud claim to justify injunctive relief, *see also Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344, 1356 (11th Cir.1982); *Itek Corp. v. First National Bank of Boston,* 511 F.Supp. 1341, 1350–51 (D.Mass.1981), *vacated and remanded on other grounds,* 704 F.2d 1 (1st Cir.1983), although not necessarily because the guarantees were released under the contract when performance was suspended. Finally, we agree with Judge Broderick, for the reasons expressed below, that Tejarat was not a "holder in due course" of the letters and was therefore not entitled to avoid the fraud in the transaction defense. *See* UCC Section 5–114(2)(a).

### 3. *Rockwell's Cross-Appeal*

Judge Broderick's order of March 1, 1983, requires Rockwell to indemnify "Citibank and its affiliates against any and all consequential damages Citibank and its affiliates may suffer, directly or indirectly, as a result of Citibank's compliance with this court's preliminary injunction...." Pursuant to the order, Citibank is required in any action

or proceeding for payment under the letters either to "give Rockwell an opportunity to assume or participate in its defense or . . . conduct its own defense with due diligence and reasonable prudence, so that [the] court's interlocutory judgment" with respect to fraud will be "adequately represented." Rockwell argues on its cross-appeal that, as a condition of indemnification, Citibank should be ordered to turn over to Rockwell its defense against claims of non-payment made in the Tribunal or elsewhere. Rule 65(c) of the Federal Rules of Civil Procedure states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant"; indemnification is, in short, a condition precedent to the grant of a preliminary injunction. The district court's order strikes us as eminently fair and we have no reason to believe that Citibank will shirk its obligation to present the fraud defense adequately, capably and with its best efforts.

Orders affirmed.