CONSARC CORPORATION, et al.

v.

IRAQI MINISTRY, et al.; United States
Department of the Treasury, Office of
Foreign Assets Control, Appellants.

Nos. 91–5308, 92–5501 and 93–5139.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 10, 1994.

Decided July 12, 1994.

Douglas Letter, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for appellants. With him on the briefs were Eric H. Holder, Jr., U.S. Atty., William B. Hoffman, Chief Counsel, and Susan Klavens Hutner, Office of Foreign Assets Control, U.S. Dept. of the Treasury, Washington, DC. John D. Bates, R. Craig Lawrence, and John C. Cleary, Asst. U.S. Attys., and Stuart M. Green, Atty., U.S. Dept. of Justice, Washington, DC, entered appearances.

Abram Chayes, Cambridge, MA, argued the cause for appellees. With him on the brief were Ramon P. Marks, Neil E. McDonell, and Theodore M. Cooperstein, New York City. Frederic B. Rose and Ronald P. Kananen, Washington, DC, entered an appearance.

On the brief for amici curiae The Bank of New York and The New York Clearing House Assn. were Stephen A. Weiner, New York City, Katherine J. Henry, Washington, DC, and John L. Warden, New York City.

Before MIKVA, Chief Judge; SENTELLE, Circuit Judge; and MacKINNON,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Consarc Corporation, a New Jersey furnace manufacturer, brought suit in the United States District Court for the District of Columbia against the Iraqi Ministry of Industry and Minerals ("IMIM") and the Rafidain Bank of Iraq (a governmental entity), alleging breach of contract and fraud arising from a sales contract between Consarc and IMIM. After Consarc obtained a default judgment against the Iraqi defendants, the Treasury Department's Office of Foreign Assets Control ("OFAC") intervened, arguing that the assets against which the judgment would be satisfied were frozen by Presidential order. Consarc filed a "supplemental" complaint that added OFAC as a defendant. There followed a series of orders from which OFAC appeals. The district court required OFAC to issue a license allowing Consarc to execute its default judgment against $6.4 million in Rafidain's account at the Bank of New York; extinguished all Iraqi interests in the $6.4 million; permanently enjoined the United States and its agencies from transferring or disposing of the $6.4 million; extinguished all Iraqi government interests in a standby letter of credit issued in favor of IMIM; and extinguished all Iraqi interests in a downpayment IMIM had made against the standby letter of credit.

We dismiss, as untimely, OFAC's appeal from the extinction of Iraqi interests in the standby letter of credit and in the down payment. We reverse the remaining orders, and remand the case for further proceedings.

**I.**

In May 1989, Consarc contracted with IMIM for the sale of several furnaces that IMIM claimed would be used for the manufacture of prosthetics. The transaction was

---

* Senior Circuit Judge MacKinnon was a member of the panel at the time this case was argued but took no part in the final decision.

to be financed by two letters of credit.[1] The first was issued by Rafidain, with IMIM as the account party and Consarc as the beneficiary, in the amount of $6.4 million. The letter obligated Rafidain to pay Consarc the named amount if and only if Consarc presented shipping documents showing that the furnaces had been exported to Iraq. Consarc's right to draw on the letter expired on February 1, 1991.

The letter was "advised" by Pittsburgh National Bank ("PNB"), an arrangement under which PNB was an intermediary without any liability. The arrangement meant that Consarc could present the shipping documents to PNB, upon which PNB would pay the credit amount from its own funds. Rafidain was obligated to reimburse PNB if the latter paid Consarc. At Rafidain's request, the Bank of New York ("BNY") agreed with Rafidain, in an independent contract, to reimburse PNB from BNY's own funds if PNB paid Consarc. BNY's binding commitment to repay PNB is called a "confirmed reimbursement credit." To induce BNY to make the commitment, Rafidain "blocked" (or pledged) $6.4 million from an account it held at BNY. In other words, Rafidain could not withdraw or otherwise use the $6.4 million in its BNY account until the letter of credit expired (at which time the pledged funds would revert to Rafidain's general account). BNY could take the pledged funds to repay itself if it reimbursed PNB.

The parties also agreed to a second letter of credit, issued by PNB and payable to Rafidain in the amount of $1.1 million. This "standby" letter secured a down payment of $1.1 million that IMIM made to Consarc. If Consarc failed to perform, IMIM could thus recapture its down payment by drawing on the standby letter.

Consarc obtained export licenses for the furnaces from the Commerce Department in 1990. Shortly before shipment, however, the Department of Defense alerted the Customs Service that Iraq actually planned to use the furnaces for its nuclear weapons program, and had falsified a declaration concerning the planned use of the furnaces. The Commerce Department revoked the export licenses, with the consequence that Consarc could not—and never did—present PNB with the shipping documents needed to draw on Rafidain's $6.4 million letter of credit. Shortly thereafter, Iraq invaded Kuwait.

On August 2, 1990, President Bush invoked his authority under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("Emergency Powers Act"). By executive order the President froze "[a]ll property and interests in property of the Government of Iraq, its agencies, instrumentalities and controlled entities" within the United States. *See Exec. Order No. 12722,* 55 Fed.Reg. 31803 (1990). OFAC implemented the order through the Iraqi Sanctions Regulations ("ISR"), codified at 31 C.F.R. §§ 575.101–575.901 (1993). The regulations provide that "[except as OFAC permits] no property or interests in property of the Government of Iraq ... may be transferred, paid, exported, withdrawn or otherwise dealt in." ISR § 575.201(a). "Transfer" is defined under the regulations to include "the issuance, docketing, filing, or the levy of or under any judgment, decree, attachment, injunction, execution, or other judicial or administrative process or order...." ISR § 575.317.

In September 1990, OFAC issued a license that permitted Consarc to commence a civil action seeking monetary damages against IMIM for breach of contract. The license provided that it did not authorize "the transfer of blocked [frozen] funds, or entry or execution of any judgment." Consarc then filed this action against IMIM and Rafidain.[2] Neither defendant appeared and on April 10,

---

1. [A] letter of credit involves three parties: (1) an issuer (generally a bank) who agrees to pay conforming drafts presented under the letter of credit; (2) a bank customer or 'account party' who orders the letter of credit and dictates its terms; and (3) a beneficiary to whom the letter of credit is issued, who can collect monies under the letter of credit by presenting drafts and making proper demand on the issuer.

*Arbest Const. Co. v. First Nat'l Bank & Trust Co.,* 777 F.2d 581, 583 (10th Cir.1985).

2. The jurisdictional basis for the suit was the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330 & 1601 *et seq.* (1988).

1991, the district court entered a default judgment against them. The judgment (1) declared that Consarc was entitled to the $6.4 million of pledged funds in the frozen Rafidain account at BNY, and that the defendants had lost any legal interest in those funds *before* the President's freeze order because of their fraud and breach of contract; (2) extinguished the defendants' interests in the standby letter of credit securing the $1.1 million down payment and in the down payment itself, which was declared to belong to Consarc; and (3) awarded Consarc $6 million in compensatory damages and $55 million in punitive damages for breach of contract and fraud. *See Consarc Corp. v. Iraqi Ministry of Indust. & Minerals,* No. 90–2269–SS, 1991 WL 534917 (D.D.C. Apr. 10, 1991).

In the meantime Consarc had sold one of the furnaces to a Japanese corporation for $1.7 million. On June 17, 1991, OFAC issued a "directive license" that required Consarc, pursuant to ISR § 575.413, to deposit the proceeds of this sale into a frozen bank account and to keep possession of the remaining furnaces. On the same day OFAC issued another directive license that prohibited any party from transferring the $6.4 million in the frozen Rafidain account at BNY. Finally, attorneys from OFAC and the Departments of State and Justice filed a "Statement of Interest of the United States" in the district court pursuant to 28 U.S.C. § 517, and moved to modify or vacate the default judgment. The statement argued that the default judgment violated the executive order and the ISR by allowing Consarc to execute against frozen Iraqi assets. Soon thereafter, Consarc sought leave to file a "supplemental complaint" against OFAC. The complaint sought an injunction to bar enforcement of the directive licenses and a declaration and order requiring OFAC to issue a license that would permit Consarc to execute against the $6.4 million at BNY. On August 22, 1991, the court allowed Consarc to file the supplemental complaint. The court also enjoined OFAC from enforcing its directive licenses, declared that the $6.4 million would remain frozen at BNY until further order of the court, and stayed execution on Consarc's de-

fault judgment. In all other respects the court denied the federal parties' motion to modify the default judgment. *See Consarc Corp. v. Iraqi Ministry of Indust. & Minerals,* No. 90–2269–SS (D.D.C. Aug. 22, 1991). OFAC and the United States filed notices of appeal from the orders of April 10 and August 22. Consarc moved to dismiss the appeal of the April 10 order, arguing that the time to appeal had elapsed and that the United States was not a proper party. The Circuit motions panel dismissed the appeal of the United States, but referred to the merits panel the question whether OFAC could appeal the April 10 order.

Consarc then asked the district court for summary judgment against OFAC on the supplemental complaint, and on December 29, 1992, the motion was granted in part. *See Consarc Corp. v. Iraqi Ministry of Indust. & Minerals,* No. 90–2269–SS, 1992 WL 415256 (D.D.C. Dec. 29, 1992). The court first held that the $6.4 million had been wrongly frozen because it belonged to Consarc on the date of the President's freeze order; the fraud and breach of contract perpetrated by IMIM meant that "the blocked funds in Rafidain's account passed to Consarc." The court thus ordered OFAC to issue a license to Consarc authorizing execution against the $6.4 million, that money to be unfrozen after Consarc received it. Furthermore, the court permanently enjoined the United States and its agencies from transferring or disposing of the $6.4 million. But the court also ruled that the remaining furnaces and the proceeds from the previously sold furnace were properly frozen under the ISR.[3]

OFAC now appeals from the orders of April 10, 1991, August 22, 1991, and December 29, 1992.

## II.

Federal Rule of Appellate Procedure 4(a)(1) provides that a notice of appeal must be filed within thirty days of entry of the judgment or order appealed from, or within sixty days when a federal agency is a party. *See* FED.R.APP.P. 4(a)(1). OFAC

---

**3.** Consarc has not taken a cross-appeal from the latter ruling.

filed its first notice of appeal of the April 10 order in September 1991, well beyond either deadline.[4] OFAC's tardiness does not bar its appeal of the portions of the April 10 judgment that decided the parties' rights in the $6.4 million at BNY, for (as we will describe) the district court reopened those questions in the orders of August 22, 1991, and December 29, 1992, both of which were appealed in time. But the default judgment of April 10 was the last time the court ruled on the standby letter of credit and the $1.1 million downpayment that the letter secured. Although OFAC was not a party on that date it could have intervened after the judgment and appealed within the time limit.

OFAC advances two theories to obtain a ruling on the letter of credit and the downpayment. It says first that the August 22 order destroyed the finality of the default judgment and reopened the entire case by allowing Consarc to file a supplemental complaint against OFAC; and because the appeal was filed within sixty days of the August 22 order the entire case is before us. Perhaps it is odd that a default judgment, once entered, could be "supplemented" by a new action against a new defendant. But as OFAC does not directly contest that ruling the only question is the effect of the August 22 order on the April 10 order.

■ A later order that revises an earlier one only in part preserves the finality of the unrevised portions. See FTC v. Minneapolis–Honeywell Regulator Co., 344 U.S. 206, 211–12, 73 S.Ct. 245, 248–49, 97 L.Ed. 245 (1952). The court modified the default judgment with respect to the $6.4 million at BNY and the licenses related to that fund, but expressly refused to disturb the earlier extinction of Iraqi rights in the standby letter of credit and in the downpayment. With respect to those rulings OFAC is in the same position as a party who moves under Rule 60(b) of the Federal Rules of Civil Procedure for relief from a default judgment after the time for direct appeal has passed, and then appeals the refusal to grant relief; such ap-

peals raise only the propriety of the refusal and not the legality of the underlying judgment itself. See Browder v. Director, Dep't of Corrections of Illinois, 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521 (1978); Branum v. Clark, 927 F.2d 698, 704 (2d Cir.1991). OFAC has requested a decision solely on the latter question, and we hold that its request is time-barred.

■ OFAC also asks us to take "pendent appellate jurisdiction" over the relevant parts of the April 10 order. This Circuit has invoked that power only in a narrow class of cases, to review an interlocutory order that itself is not yet subject to appeal but is "closely related" to an appealable order. See, e.g., Wagner v. Taylor, 836 F.2d 578, 585–86 (D.C.Cir.1987); Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant, 760 F.2d 312, 315 (D.C.Cir.1985). In such cases the exercise of pendent jurisdiction provides the first opportunity for appellate consideration of the nonfinal order. Later the appellant may secure review as of right in any event; the question is simply whether the order will be considered then or now. Economy counsels that it be taken up as soon as possible, for the overlap between the final and the nonfinal order means that joint consideration will obviate the need for later proceedings in the trial court and on appeal. See Energy Action Educ. Found. v. Andrus, 654 F.2d 735, 745 n. 54 (D.C.Cir.1980), rev'd on other grounds, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981). But when the appellant has neglected to secure review as of right and nothing remains to be done below, to hear the untimely appeal would disarrange the orderly procedure that the Rules seek to attain, without any countervailing benefit to judicial efficiency. We hold that pendent appellate jurisdiction may not be invoked to review an order appealed out of time. We thus dismiss the appeal insofar as it relates to the standby letter of credit and the downpayment.

---

4. OFAC's motion to amend the default judgment was not filed until June 17, 1991, outside the ten-day limit of Rule 59(e) of the Federal Rules of Civil Procedure. Thus the motion to amend did not trigger the tolling provisions of Rule 4(a)(4)

of the Federal Rules of Appellate Procedure, which suspend the running of the appeal period only upon a timely motion under Rule 59, or a motion filed under Rule 60 within ten days after entry of the judgment.

### III.

OFAC has timely appealed the orders that allowed Consarc to execute against the $6.4 million at BNY. As the appeal arises from a grant of summary judgment we review the district court's legal conclusions *de novo. See DynaQuest Corp. v. United States Postal Serv.*, 12 F.3d 1144, 1146 (D.C.Cir.1994). Under the regulations "no property or interests in property of the Government of Iraq that are in the United States ... may be transferred...." ISR § 575.-201(a). The district court's award to Consarc of the $6.4 million in the Rafidain account at BNY was a "transfer" under § 575.317 of the regulations. *See Itek Corp. v. First Nat'l Bank of Boston*, 704 F.2d 1, 6–8 (1st Cir. 1983). The only question before us, then, is whether the transfer deprived Iraq of "property or interests in property" that it held on the date of the freeze order.

Consarc contends that New York law supplies the content of these terms. It argues that the arrangement between the parties created a trust with a condition subsequent (presentation of the shipping documents); that the President's revocation of the export licenses for the furnaces made the condition illegal, and therefore void; and that under New York law funds held in a voided trust instantly become the property of the beneficiary by operation of law. The argument attempts to show that the Iraqi entities lost all legal interest in the BNY funds when the licenses were revoked—before the freeze order.

OFAC, on the other hand, says that the case raises only questions of federal law, that letters of credit are "property" within the meaning of the statute and of its regulations, and that the application of its regulations in the present case is to be judged under the law governing international letters of credit. *See Centrifugal Casting Mach. Co. v. Ameri-*

*can Bank & Trust Co.*, 966 F.2d 1348, 1351 & n. 3 (10th Cir.1992) (describing nature and sources of letter of credit law). Apparently the directive license that blocked execution against the Rafidain funds rested on that ground.

We think that OFAC may choose and apply its own definition of property interests, subject to deferential judicial review.[5] By section 1704 of the Emergency Powers Act the President may "issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter." 50 U.S.C. § 1704. Among those authorities is the power to "prohibit any ... transfer [of] ... any property in which any foreign country or a national thereof has any interest." *Id.* § 1702(a)(1)(B). The President delegated his power to define the statutory terms to the Secretary of the Treasury, *see Exec. Order No. 12724*, 55 Fed.Reg. 33089 (1990), and OFAC exercises the delegated power on the Secretary's behalf. By these provisions OFAC has received the authority to administer the statute, *cf. Wagner Seed Co. v. Bush*, 946 F.2d 918, 920 (D.C.Cir. 1991), *cert. denied*, ─── U.S. ───, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992), so that we must give effect to OFAC's regulations unless they contradict express statutory language or prove unreasonable. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).

This case, moreover, turns solely on the application of the OFAC regulations to the facts. The regulations define "property" and "property interest" to include "letters of credit," "bank accounts and deposits," and any "present, future or contingent" interests therein. ISR § 575.315. The directive license of June 17, 1991, in substance an informal adjudication and order, held that the

---

**5.** The property law of the state in which the contested assets are situated would of course be relevant in a subsequent action in the Court of Claims on the ground that the Emergency Powers Act, as applied by OFAC in this case, worked a constitutional taking of Consarc's property that must be compensated. *See Lucas v. South Carolina Coastal Commission*, ─── U.S. ───, ─── ───, 112 S.Ct. 2886, 2899–2901, 120 L.Ed.2d

798 (1992); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000–04, 104 S.Ct. 2862, 2871–74, 81 L.Ed.2d 815 (1984). But in the present case Consarc seeks injunctive relief, which does not lie against a statutorily authorized action alleged to constitute a taking so long as the remedy of inverse condemnation is available. *See Preseault v. ICC*, 494 U.S. 1, 11, 110 S.Ct. 914, 921–22, 108 L.Ed.2d 1 (1990).

BNY funds were property of Iraq within the meaning of the regulations. That judgment, as a contemporaneous application of OFAC's own regulations, receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation. *See Stinson v. United States,* — U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993); *Hazardous Waste Treatment Council v. Reilly,* 938 F.2d 1390, 1395 (D.C.Cir.1991). We thus have warrant only to inquire whether OFAC's construction of the regulatory terms "letter of credit" and "present, future or contingent [interest]" so far departed from common usage as to be plainly wrong. *See Centrifugal Casting,* 966 F.2d at 1351.[6]

 In the present case OFAC's determination was fully in accord with the general law governing letters of credit and thus survives our review. A letter of credit remains wholly executory until the beneficiary has strictly complied with its terms. *See Union Planters Nat'l Bank v. World Energy Sys. Assoc.,* 816 F.2d 1092, 1098 (6th Cir. 1987); *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2d Cir.1970). The letter issued by Rafidain specified that the funds in the Rafidain account at BNY would revert to IMIM on February 1, 1991, unless Consarc had tendered documents proving shipment of the furnaces. As of August 2, 1990—the date of the freeze order—the tender had not been made, and the Iraqi entities then possessed a contingent reversionary interest in the funds sufficient to bring the funds within ISR § 575.315.

 Consarc directs us to cases that discuss the principle of "fraud in the transaction" under letter of credit law. *See, e.g., Rockwell Int'l Sys. Inc. v. Citibank S.A.,* 719 F.2d 583, 589 (2d Cir.1983); *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 15 n. 3 (2d Cir.1979). Those cases establish a limited doctrine by which the issuing or confirming bank may refuse to honor an attempt to draw on a letter of credit if the beneficiary has presented fraudulent conforming documents or has fraudulently defaulted on the

underlying contract. *See Rockwell,* 719 F.2d at 589; *KMW Int'l,* 606 F.2d at 16. They do not stand for the converse proposition that an account party's fraud with respect to the underlying sales contract allows the beneficiary to draw on the letter without presenting the conforming documents. *See* James J. White & Robert S. Summers, 2 UNIFORM COMMERCIAL CODE § 19–7, at 58–65 (1988) (arguing fraud in the transaction doctrine limited to fraud by the beneficiary).

Even on Consarc's view, moreover, the funds would have reverted to Rafidain when the letter expired unless Consarc had made a timely (albeit nonconforming) demand. In fact Consarc made no demand of any kind until January 22, 1991. On August 2, 1990, therefore, Rafidain still held a reversionary interest in the funds regardless of whether Consarc's inability to perform the underlying contract excused it from compliance with the terms of the letter. On the date of the President's order the Iraqi parties had an contingent interest in the funds sufficient to subject them to the freeze.

## IV.

We dismiss the appeal in part, thus letting stand the district court's orders that extinguished the standby letter of credit and awarded Consarc the accompanying downpayment. We reverse the district court's orders that awarded the funds to Consarc, that enjoined OFAC to issue an unblocking license, and that enjoined the United States and its agencies from transferring or disposing of the blocked funds. We also remand the case for further proceedings. On remand the district court will restore the *status quo ante* with respect to the $6.4 million, and conduct such proceedings as to the other matters in controversy as may be appropriate.

*It is so ordered.*

---

**6.** It is doubtless true that "at some point the judiciary must be able to review the extent of Treasury's authority under [the Emergency Powers Act] and to determine that certain property is beyond the reach of Treasury's asset control reg-

ulations." *Itek Corp.,* 704 F.2d at 10. But here Consarc raises no claim that the regulations are themselves inconsistent with the underlying statute, so that question is not before us.