**CONSARC CORPORATION and Consarc Engineering, Ltd., Appellees,**

v.

**UNITED STATES TREASURY DEPARTMENT, OFFICE OF FOREIGN ASSETS CONTROL, Appellant.**

**No. 94–5390.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1995.

Decided Dec. 15, 1995.

Douglas N. Letter, Litigation Counsel, United States Department of Justice, argued the cause, for appellant, with whom Frank W. Hunger, Assistant Attorney General, and Eric H. Holder, Jr., United States Attorney, United States Department of Justice, and William B. Hoffman, Chief Counsel, and Susan K. Hutner, Senior Attorney, United States Department of the Treasury, were on the briefs.

Ramon P. Marks argued the cause, for appellees, with whom Neil E. McDonell, was on the brief.

Stephen A. Weiner was on the brief, for amicus curiae The Bank of New York.

Before: BUCKLEY, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), the government agency charged with maintaining assets of Iraq within the United States in order to assure a fair distribution of this property among parties with claims against the Iraqi government, appeals from a District Court order requiring OFAC to release to appellees Consarc Corporation and Consarc Engineering, Ltd. ("Consarc") certain furnaces that these manufacturers had intended to sell to Iraq. OFAC argues that the District Court did not comply with our mandate in our prior review of this case, see Consarc Corp. v. Iraqi Ministry, 27 F.3d 695 (D.C.Cir.1994) ("Consarc I"), in fashioning its most recent order. It also complains that the District Court wrongly found that OFAC could not "freeze" the furnaces according to OFAC's own on-point regulation. We agree on both grounds, and so reverse the order of the District Court.

## I. BACKGROUND

Although an extensive history of this matter appears in Consarc I, see 27 F.3d at 697–99, a brief summary of that history clarifies the issues involved in this appeal. In May 1989, Consarc, a New Jersey corporation, agreed to sell to the Iraqi Ministry of Industry and Minerals ("IMIM") two electron beam furnaces that IMIM claimed were to manufacture prosthetics. IMIM made a down payment on the furnaces of $1.1 million to Consarc. An Iraqi bank, Rafidain, pledged an additional $6.4 million of its account in The Bank of New York in order to induce another bank, Pittsburgh National, to pay Consarc once Consarc demonstrated that it had shipped the furnaces. If Pittsburgh National paid Consarc at the appropriate time, and Rafidain then did not reimburse it, Pittsburgh National could claim the $6.4 million set aside in The Bank of New York as its payment. Otherwise, Rafidain would regain full control over The Bank of New York account.

Before Consarc could ship the furnaces, however, the Commerce Department discovered that Iraq did not intend to use these furnaces to make prosthetics, but to aid in its development of nuclear weapons. Consequently, the Commerce Department blocked the shipment of the furnaces. Soon thereafter, Iraq invaded Kuwait.

In response to the invasion, on August 2, 1990, President Bush froze all Iraqi interests in property within the United States under the International Emergency Economic Powers Act ("IEEPA"). See Exec. Order No. 12722, 55 Fed.Reg. 31803 (1990), as authorized by 50 U.S.C. § 1701. OFAC implemented the Executive Order through regulations that provide that "no ... interests in property of the Government of Iraq ... may be transferred ... or otherwise dealt in." Iraqi Sanctions Regulations ("ISR"), 31 C.F.R. § 575.201(a) (1995). According to the ISR, OFAC intends to have all property in which Iraq has an interest placed in "blocked," or frozen, accounts. See 31 C.F.R. § 575.203 (1995). Pursuant to these regulations, OFAC froze the $6.4 million set aside in Rafidain's account in The Bank of New York, and, later, instructed Consarc to freeze all the goods that had been ordered by IMIM. Because Consarc had already re-sold one of the furnaces to Mitsubishi Metals, OFAC also instructed Consarc to freeze the proceeds from that sale.

Against this regulatory backdrop, Consarc, with the conditional consent of OFAC, sued IMIM for fraud. In a series of orders, the District Court awarded Consarc the $6.4 million set aside by Rafidain in The Bank of New York as part of a default judgment. The District Court further invalidated the agreement that would have allowed IMIM to recoup its down payment and extinguished all Iraqi interest in the down payment itself, thus giving Consarc an additional $1.1 million free and clear. However, the District Court was willing to find that IMIM had a property interest in the furnaces, which permitted OFAC to continue to hold the remaining goods and the proceeds from the sale of one furnace to Mitsubishi, as long as Consarc received the $6.4 million that had been set aside in The Bank of New York. The District Court consequently ordered OFAC to release the $6.4 million in The Bank of New York to Consarc, but ordered Consarc to freeze the remaining furnace as well as the

proceeds that Consarc had received from the sale of the second furnace. *See Consarc I*, 27 F.3d at 699.

On appeal, we dismissed OFAC's attempts to reestablish an Iraqi interest in the down payment as time-barred. *See id.* at 700. Otherwise, we ordered that "[o]n remand the district court will restore the *status quo ante* with respect to the $6.4 million, and conduct such proceedings as to the other matters in controversy as may be appropriate." *Id.* at 702.

On remand, the District Court reconsidered its opinion in light of *Consarc I*. *See Consarc Corp. v. United States Treasury Dep't Office of Foreign Assets Control ("Consarc II")*, 871 F.Supp. 1463, 1464 (D.D.C. 1994). It justified this reconsideration as pursuant to our order to conduct other appropriate proceedings, *see id.*, and concluded that "[e]quity and fairness demand" that Consarc regain control over either the $6.4 million or the furnaces. *Id.* at 1465. To that end, the District Court extinguished any Iraqi interest in the furnaces that IMIM had arranged to purchase, and ordered OFAC to release to Consarc both the $1.7 million received from the prior sale of one furnace and the remaining furnace. In exchange, Consarc was to restore the $6.4 million, plus interest, into "a blocked account." *Id.* at 1466. The District Court also indicated that Consarc was to have a "$6.4 [million] claim against the blocked account." *Id.* at 1465. Consarc has since placed the $6.4 million into a blocked account, but one under a different name and in a different bank than Rafidain's original Bank of New York account.

OFAC has again appealed, protesting that the District Court wrongly interpreted the relevant IEEPA provisions and OFAC's own regulations. OFAC also contends that this court should compel Consarc to restore the $6.4 million to Rafidain's original account in The Bank of New York, not some other blocked account, as per this court's order in *Consarc I*.

## II. DISCUSSION

At issue in this appeal are the District Court's interpretations of our mandate in *Consarc I*, the scope of OFAC's authority under the IEEPA, and one of OFAC's own regulations. We need look no further than the plain meaning of each to reverse the conclusions of the District Court.[1]

### A. *Consarc I*

■ OFAC first challenges the District Court's interpretation of *Consarc I*. In particular, OFAC disputes the meaning of the phrase "*status quo ante*" as used in that decision.

Prior to the start of this litigation, OFAC had "blocked" Rafidain's pledge of $6.4 million in Rafidain's account in The Bank of New York. The District Court subsequently ordered The Bank of New York to transfer that amount to Consarc in 1993. We then reversed the District Court and directed it to "restore the *status quo ante* with respect to the $6.4 million." *Consarc I*, 27 F.3d at 702. In its subsequent order, the District Court instructed Consarc to "place into a blocked account ... the amount of $6,422,418.10, plus interest, which constitute[s] the funds set aside in 1989 to pay Consarc under the letter of credit issued by Rafidain Bank and turned over by The Bank of New York to Consarc in 1993." *Consarc II*, 871 F.Supp. at 1466. Ostensibly responding to this order, Consarc placed the proper amount into a blocked account in a bank other than The Bank of New York and into an account not in Rafidain's name.

This result does not restore the *status quo ante*. *Webster's Third New International Dictionary* defines *status quo* as "the existing state of affairs ... at the time in question." *Id.* at 2230 (1961). As *ante* means "prior," *see id.* at 90, the plain meaning of *status quo ante* denotes the state of affairs prior to the District Court's order at issue in the appeal. As that order had compelled The Bank of New York to transfer the $6.4 million from Rafidain's account to Consarc, a return to the *status quo ante*, as commonly understood, must include a restoration of

---

1. In light of this disposition, we need not address appellee's motion to strike portions of the reply brief.

that sum (plus interest) to the same account in the same bank.

The legal definition of *status quo ante* has a similarly clear meaning and reaches the same result. *Black's Law Dictionary* defines *status quo* to mean "the existing state of things at any given date" and offers the example "[s ]tatus quo ante bellum" to mean "the state of things before the war." *Black's Law Dictionary* 1264 (5th ed. 1979). Judicial precedent confirms that "[t]he status quo is the last uncontested status which preceded the pending controversy." *Westinghouse Electric Corp. v. Free Sewing Machine Co.,* 256 F.2d 806, 808 (7th Cir.1958); *see also Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952, 961 (Fed.Cir.1984). As the last uncontested status in this matter saw the $6.4 million blocked in Rafidain's account in The Bank of New York, the placement of this sum into a blocked account in another bank does not return this matter to the *status quo ante.*

We have explained *status quo ante* at some length in order to preclude further misunderstanding. We intend the District Court to restore the parties to the positions that they would have enjoyed had the District Court not entered its previous orders. Before the present controversy, the sum at issue rested in Rafidain's account at The Bank of New York. After the District Court rewrites its order, we expect Consarc to restore that sum, plus appropriate interest, to a blocked account in the name of Rafidain Bank at The Bank of New York. For similar reasons, we also expect the District Court to declare that Consarc only holds a general claim against Iraq, not a specific claim against the $6.4 million that is to be restored to Rafidain's account.[2] That said, we again direct the District Court to restore the *status quo ante* with respect to the $6.4 million.

B. *International Emergency Economic Powers Act and the Iraqi Sanctions Regulations*

OFAC also protests the District Court's order compelling OFAC to release to Con-

sarc the remaining furnace and the proceeds from the sale of the other furnace. OFAC bases its appeal on its interpretation of one provision of the Iraqi Sanctions Regulations ("ISR"). This provision reads:

> The prohibitions [on transfer of Iraqi-interested goods] contained in § 575.201 do not apply to goods manufactured ... for export to Iraq ... if the Government of Iraq has never held or received title to such goods ... and if any payment received from the Government of Iraq with respect to such goods is placed in a blocked account in a U.S. financial institution pursuant to § 575.503.

31 C.F.R. § 575.413 (1995). OFAC interprets this regulation to require Consarc either to place the goods and any proceeds from the sale of those goods to non-Iraqi entities into a blocked account or to place any payment received from Iraq—namely, the $1.1 million down payment—for the goods into a blocked account. Consarc protests that this interpretation is neither within the clear meaning of the International Emergency Economic Powers Act nor a reasonable interpretation of the regulation itself. We examine each of Consarc's claims in turn.

1. *Interpretation of the International Emergency Economic Powers Act*

■ We have already determined that Iraq has no existing interest in the down payment that Consarc has already received. *See Consarc I,* 27 F.3d at 700. Consarc thus argues that OFAC cannot control the down payment under the IEEPA because the IEEPA limits a Presidential freeze to property or transactions involving property in which the enemy country has some interest. *See* 50 U.S.C. § 1702(a)(1). As OFAC asserts that its regulation would require Consarc to place the down payment into a blocked account should Consarc want OFAC to release the remaining furnace and the

---

**2.** For reasons it did not explain, the District Court added to our mandate in *Consarc I* in order to give Consarc a specific claim against the blocked account. We also reverse that result, and direct the District Court to give Consarc only

a general claim against Iraq, or, in other words, the type of claim that Consarc would have had had the District Court not erred in its most recent order on this matter. *See Consarc II,* 871 F.Supp. at 1465–66.

proceeds from the sale of the other furnace, Consarc concludes that the regulation exceeds the plain bounds of the authorizing statute. The District Court appears to have agreed, noting that "OFAC has no authority to block the down payment because the government can only block those payments in which Iraq has an interest." *Consarc II*, 871 F.Supp. at 1465.

■ As OFAC is the agency authorized to oversee the freeze, *see* 31 C.F.R. § 575.805 (1995), a challenge to its interpretation must either demonstrate that the statute clearly forbids the agency's interpretation or that the interpretation is unreasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Consarc argues only the former, and it is not persuasive. In order to conclude that OFAC's regulation exceeds the authority delegated to it by the plain meaning of the statute, we would have to narrow the language of the IEEPA to an extent that itself would be unreasonable. The IEEPA grants broad powers to the President to control property within the dominion of the United States in which an enemy nation has an interest. The pertinent section of the IEEPA permits the executive branch

> [to] investigate, regulate or prohibit … transfers of credit or payments … by … any banking institution, to the extent that such transfers … involve any interest of any foreign country … [and] transactions involving … any property in which any foreign country … has any interest.

50 U.S.C. § 1702(a)(1). This extensive statutory grant of power cannot be read to bar OFAC from promulgating a regulation that requires a corporation to freeze either the goods it manufactured for Iraq or any payments received for these goods from Iraq. Although Iraq may no longer have any interest in its down payment, it still has some interest in the goods for which the down payment was paid and some interest in the transaction. The text of the statute thus does not clearly forbid OFAC from enforcing its regulation against the down payment or the goods themselves.

### 2. Interpretation of Iraqi Sanctions Regulation § 575.413

■ Appellees also question OFAC's interpretation of 31 C.F.R. § 575.413 (1995). Consarc again argues that § 575.413 does not require Consarc to place the down payment into a blocked account because Iraq has no interest in the down payment. *See Consarc I*, 27 F.3d at 700. Because Consarc had received no other payment from Iraq and Iraq never held title to the goods, Consarc believes that, as the District Court concluded, it "has satisfied all of the requirements of § 575.413." *Consarc II*, 871 F.Supp. at 1465.

Such belief is unfounded. Both appellee and the District Court have misinterpreted the text of the regulation, which provides an exception to the general freeze on transactions or property involving an Iraqi interest. *See* 31 C.F.R. § 575.201(a) (1995). Before goods that were "manufactured … for export to Iraq" may be released free and clear to their manufacturer, the manufacturer must show that:

1) Iraq "has never held or received title to such goods;" and

2) "any payment received from the Government of Iraq with respect to such goods" has been placed in an appropriate blocked account.

31 C.F.R. § 575.413 (1995).

Here, Consarc has not fulfilled the second threshold with respect to the down payment that it received for the furnaces. Although the law of the case establishes that the Iraqi government has no property interest in the down payment itself, *see Consarc I*, 27 F.3d at 700, this lack of interest in the down payment is irrelevant to whether the requirements of § 575.413 have been satisfied. Section 575.413 requires that all payments from Iraq—not merely those payments in which Iraq maintains an interest—be placed into a blocked account before OFAC may release the goods. Consarc has not placed the down payment, which all parties concede was received from the Government of Iraq with respect to the furnaces that Iraq had ordered, into a blocked account. Unless and until this payment is placed in a suitable blocked account, the narrow exception provided for in the above regulation does not

apply, and the proceeds from the sale of one furnace and the remaining furnace are subject to OFAC's authority.

 We thus have no difficulty concluding that the meaning of the text of § 575.413 agrees with OFAC's interpretation of that regulation. Moreover, an interpretation of the ISR by OFAC, being an agency's application of its own regulations, receives "an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation." *Consarc I,* 27 F.3d at 702. In light of the reasonableness of OFAC's interpretation, the deference owed OFAC, and the general interpretive principle that exceptions to a broad regulatory scheme are to be read narrowly, *cf. Commissioner v. Clark,* 489 U.S. 726, 739, 109 S.Ct. 1455, 1463, 103 L.Ed.2d 753 (1989), we are compelled to reverse the District Court. The District Court's appeal to "[e]quity and fairness" affects neither our reasoning nor our result. Even a well-founded claim in equity would not suffice to override the plain effect of the law.[3]

### III. CONCLUSION

 "No principle of law is better established than the rule that a District Court is bound 'by the decree [of the Court of Appeals] ... and must carry it into execution, according to the mandate.'" *Mays v. Burgess,* 152 F.2d 123, 124 (D.C.Cir.1945) (citation omitted). In this case, the District Court, for whatever reason, did not resolve the proceedings on remand as we thought we had directed. Nor have appellees conformed to our order in *Consarc I.* We therefore again reverse and remand to the District Court to conduct proceedings entirely consistent with this ruling. We expect that the District Court will order Consarc to restore the sum of $6,422,418.10, plus appropriate interest, to a blocked account in Rafidain's name in The Bank of New York. We also expect that the District Court will make clear

that any claim Consarc has against Iraq is only a general claim. Finally, we expect that the District Court will permit OFAC to block the unsold 400 KW/120 KW electron beam refining and melting furnace and other unsold goods ordered by IMIM in 1989 as well as the proceeds, along with any interest accrued, obtained from any sale of the goods once ordered by IMIM, unless and until Consarc places any payment received from Iraq for the goods IMIM had ordered into an appropriate blocked account and otherwise complies with § 575.413.

*It is so ordered.*

---

**3.** Arguably, the District Court's equitable concerns here are not well-founded. OFAC has control over only a limited sum of Iraqi assets. These assets are a critical source of relief for the many parties who, like Consarc, have unsatisfied claims against the Iraqi government. Were Consarc to receive all that the District Court decided to give it in the name of "fairness," these other parties might suffer disproportionate loss. It is OFAC and not the courts that must seek to attain the fairest result to the greatest number.