**BERGERCO CANADA, A DIVISION OF CONAGRA, LTD., Plaintiff,**

v.

**IRAQI STATE COMPANY FOR FOOD STUFF TRADING, et al., Defendants.**

Civil Action No. 92–2781 (JHG).

United States District Court, District of Columbia.

April 12, 1996.

As Amended April 22, 1996.

Theodroe M. Cooperstein, Federal Bureau of Investigation, Washington, DC, Ronald Paul Kananen, Marks & Murase, Washington, DC, Frederic B. Rose, Ramon P. Marks, Neil E. McDonell, Marks & Murase, New York City, for plaintiff.

James Robert Layton, Robert Lawrence Shapiro, U.S. Attorney's Office, Washington, DC, for United States Treasury Department, Office of Foreign Assets Control.

Joan M. Secofsky, New York City, for Bank of New York.

D. Edward Wilson, Jr., Haynes & Boone, L.L.P., Washington, DC, for The Royal Bank of Canada.

## *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

Presently pending are the parties' cross-motions for summary judgment. For the reasons explained below, the plaintiff's motion for summary judgment will be denied as to Count IV and granted in part and denied in part as to Count III; Defendant Bank of New York's motion for summary judgment on Count IV will be granted and judgment shall be entered accordingly in favor of the Bank of New York; and the Office of Foreign Assets Control's ("OFAC") motion for summary judgment on Count III will be denied. Because OFAC improperly applied its amended regulation retroactively, this matter will be remanded to OFAC to consider ConAgra's application for a license under the General License No. 7 regulations of August 15, 1990.

### I. Background

The following facts are undisputed. Plaintiff Bergerco Canada ("Bergerco"), a Canadian federal corporation, is a division of ConAgra, Ltd. ("ConAgra"). In February 1990, Bergerco and its American affiliate, Bergerco US, entered into a contract with Iraqi State Company for Food Stuff Trading ("Iraqi State Company"), an Iraqi government procurement agency, to sell and ship yellow split peas and white beans from the United States, Australia and Canada to Iraq. Plaintiff Bergerco was the supplier of the split peas shipped from Canada.

Payment for Bergerco's shipments from Canada was financed through an irrevocable letter of credit, L/C 4659/106 ("Letter of Credit"), which was issued for the account of Iraqi State Company on March 6, 1990, by Rasheed Bank, an Iraqi government-owned bank.[1] Bergerco was the beneficiary. The Letter of Credit was advised by the Royal Bank of Canada ("RBC") and provided for payment to be made from funds in Rasheed Bank's account at the Bank of New York ("BNY"), which was designated as the reimbursing bank.[2]

The underlying contract provided for 8,000 tons of yellow split peas to be shipped to Iraq in two shipments. The first shipment and reimbursement proceeded without incident. After the first shipment arrived, Bergerco made conforming presentment, which was accepted by Rasheed Bank and paid through BNY. *See* Coles Decl., at ¶¶ 30–31. Bergerco's present claim arises from the second shipment, which was discharged in Aqaba, Jordan on June 25, 1990. *Id.* at ¶¶ 30–31 & Exhibits 24 & 25. After the Iraqi State Company accepted the goods, Bergerco presented the required documents to RBC, which forwarded them to Rasheed Bank by overnight mail, arriving on July 10, 1990. *Id.* at ¶ 34, Ex. 28. Rasheed Bank accepted the documents on that date, thereby owing Bergerco, under the terms of the Letter of Credit, the contract amount of US$1,964,016.94. *Id.* On July 12, 1990, RBC advised Bergerco by facsimile transmission ("fax") of two matters relevant to this transaction: that the shipping documents were delivered to Rasheed Bank, and that on July 11, 1990, RBC had telexed BNY requesting the status and

1. In relevant part (with typographical errors as contained in the original), the Letter of Credit provided:

> DEAR SIRS:
> WITHOUT ADDING YOUR CONFIRMATION PLEASE NOTIFY MESSRS BERGERCO CANADA, A DIVISION OF AGRO WEST LIMITED ... WE ESTABLISHMENT OUR IRREVOCABLE LETTER OF CREDIT NO:—4659/106 IN THEIR FAVOUR FOR ACCOUNT OF M/S: STATE COMPANY FOR FOOD STUFF TRADING, BAGHDAD. UPTO THE AGGREGATE AMOUNT OF:—US $2,000,-000/—(USDOLLAR TWO MILLION ONLY)
> AVAILABLE FOR PAYMENT IN CANADA, VALID UNTIL 4/8/1990.

> AGAINST THEIR RECEIPT OR SIGHT DRAWN ON US, ACCOMPANIED BY DOCUMENTS SPECIFIED HERE BELOW MARKED WITH THIS CREDIT NUMBERD-BUYER'S INDENT NO:—YELLOW SPLIT PEAS 1/90.

Chapeau to Letter of Credit, attached to Declaration of Marcus Coles of April 26, 1993 ("Coles Decl."), at Exhibit 18.

2. Paragraph 13 of the Letter of Credit provides: "In reimbursement of your [RBC's] payment, against documents in conformity with the terms of this L/C, draw on our account with the Bank of New York, New York, U.S.A. under advice." Coles Decl., at Exhibit 18.

date when payment might be expected under the Letter of Credit.[3]

On July 30, 1990, a few days before President Bush issued Executive Order 12722 on August 2, 1990,[4] the Iraqi State Company agreed to instruct Rasheed Bank to release the balance due after meeting with Bergerco representatives. *See* Coles Decl., at ¶ 39. On September 4, 1990, "Rasheed Bank instructed BNY to honor Bergerco's claim of payment of US $1,964,016.94." *Id.* (citing Exhibit 32). BNY contends it first heard from RBC about this request on September 21, 1990, when BNY received a telex from RBC. *See* Affidavit of Constance Thatcher ("Thatcher Affidavit"), at ¶ 11, attached to BNY's Motion for Summary Judgment. The telex stated in relevant part:

> The following is a copy of a message sent to your reimbursement Dept.
>
> Negotiated documents for USD 1,964,-016.94 drawn under L/C 4659/106 issued by Rasheed Bank, Baghdad, Iraq. Kindly credit USD 1,964,016.94 to our Toronto A/C Nbr 218–715–1 with our NY office quoting Manitoba International Trade Centre Ref We 3150.
>
> *This reimbursement claim is effected on the strength of a tested telex authority dated Sept 4/90 received from Rasheed Bank,* Baghdad.

RBC telex of Sept. 21, 1990, attached to Coles Decl., at Exhibit 32 (emphasis added).

On September 24, 1990, in response to RBC's telex of September 21, BNY advised RBC that it was barred from releasing the funds because of President Bush's executive order, which froze Iraq's property and interests in property in the United States. *See* Coles Decl., at ¶ 42 & Exhibit 33; BNY's

Memorandum of Points and Authorities in Support of its Motion for Summary Judgment Against Plaintiff Bergerco Canada ("BNY's Memorandum"), at 3.

Even before Rasheed Bank issued its September 4th directive, Bergerco sought relief from OFAC, requesting a license that would permit BNY to pay the amounts due Bergerco from funds in Rasheed Bank's account at BNY. On behalf of Bergerco, ConAgra made its first such request on August 21, 1990. Waters Decl., at ¶ 4 & Exhibit A. After a series of communications, *id.* at ¶¶ 5–9, OFAC denied the application, stating that Bergerco's request for repayment from BNY "rest[ed] solely on an unconfirmed reimbursement." *Id.* at Exhibit B (Letter of November 20, 1990, from R. Richard Newcomb, Director, Office of Foreign Assets Control to Ms. Waters, ConAgra, Inc.).

On February 4, 1992, May 26, 1992, and August 10, 1992, ConAgra applied to OFAC for a license that would authorize BNY to release the funds to Bergerco. *See* Declaration of Neil E. McDonell ("McDonell Decl."), at ¶ 2, Exhibits C, E, & G, attached to Bergerco's Motion for Summary Judgment. OFAC denied each application. *Id.* at Exhibits D, F & H.

On December 10, 1992, Bergerco filed its complaint in this matter, seeking damages, injunctive and declaratory relief against the Iraqi State Company, Rasheed Bank, OFAC, BNY and RBC. Against the Iraqi State Company and Rasheed Bank, Bergerco sought damages arising from Iraqi State Company's breach of contract for failing to pay the monies due and from Rasheed Bank's failure to pay under the irrevocable letter of credit (Counts I and II). Against

---

**3.** The RBC telecopier transmission of July 12, 1990, authored by S. Games, states:

> Today we learned from DHL that envelope containing ship. docs. were (sic) delivered to the subject bank [Rasheed] on July 10–1990 and receipt signed by Iman Abdul Rasul.
>
> Yesterday, July 11/90 we telexed correspondent [BNY] requesting status and date when we may expect payment.
>
> We shall keep you informed of developments.

Coles Decl., at Exhibit 28.

**4.** On August 2, 1990, Iraq invaded Kuwait. Under the authority of the International Emergency

Economic Powers Act, 50 U.S.C. §§ 1701–1706 (1988 & Supp. V 1993), the President issued Executive Order No. 12722, freezing all "interests in property of the Government of Iraq, its agencies, instrumentalities and controlled entities" within the United States. *See* E.O. No. 12722, 55 Fed.Reg. 31803 (Aug. 2, 1990). This executive order was superseded by Executive Order No. 12724, 55 Fed.Reg. 33089 (Aug. 9, 1990), which implemented a resolution by the United Nations Security Council. The provisions imposing the freeze remained in effect.

OFAC, the plaintiff seeks a declaration that it is entitled to a specific license under the Iraqi Sanctions Regulations ("ISR"), 31 C.F.R. Part 575. (Count III). Against BNY and RBC, Bergerco seeks injunctive and declaratory relief directing the release of the funds in Rasheed Bank's account to the plaintiffs. (Count IV).

On July 26, 1994, this Court granted Bergerco's motion for a default judgment against the Iraqi State Company and Rasheed Bank. The cross-motions for summary judgment by Bergerco on Counts III and IV, by BNY on Count IV and by OFAC on Count III followed.

## II. Discussion.

In its motion for summary judgment, Bergerco offers two principal arguments in an attempt to obtain release of the frozen funds. The first argument turns on whether Iraq had an interest in the Rasheed Bank account at BNY on August 2, 1990, when the President froze Iraq's assets in the United States. Bergerco essentially argues that Iraq had no interest in the account, because Bergerco had made conforming presentment to Rasheed Bank well before the account was frozen. *See* Bergerco's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at 6, 11, 16 & 36. Thus, Bergerco contends that BNY must release the funds and that OFAC exceeded its authority "[by blocking indefinitely a payment under an irrevocable letter of credit in which Iraq no longer had an interest.]" *Id.* at 13. Second, Bergerco challenges OFAC's regulations as contrary to the underlying statutory authority, claiming that OFAC improperly applied an amended regulation retroactively and that OFAC's decisions denying Bergerco's license applications were arbitrary and capricious. *Id.* at 10–33.

### *The standard of review.*

█ Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether genuine issues of material fact are present, courts are not strictly limited to the evidentiary materials listed in Rule 56(c), but may consider other materials if those materials would be admissible at trial. *E.g., Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 (7th Cir.1991) (medical records appropriate evidentiary materials for consideration in connection with motion for summary judgment, because such materials are admissible under FRE 803(4) & 803(6)). *See generally* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2724, at 73. Thus, unless the nonmovant can demonstrate a genuine issue for trial through its "pleadings, depositions, answers to interrogatories and admissions on file, together with [any] affidavits," Fed.R.Civ.P. 56(c), or through other evidentiary material that would be admissible at trial, summary judgment is appropriate. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra,* § 2721, at 40 (citing cases).

Because there are no genuine issues as to any material facts underlying Bergerco's claims, summary judgment is appropriate. Since BNY's summary judgment motion ultimately prevails, Bergerco will be viewed as the nonmovant and, as such, will receive all justifiable inferences in its favor.

### *International Letters of Credit.*

The transaction at issue was financed by an international letter of credit, which gener-

ally involves an account party, an issuing bank and a beneficiary. *See, e.g., Arbest Const. Co. v. First Nat'l Bank & Trust Co.,* 777 F.2d 581, 583 (10th Cir.1985). The transaction may also include other banks that act as correspondent banks to advise, pay, negotiate or confirm the credit. *See, e.g., Consarc Corp. v. Iraqi Ministry,* 27 F.3d 695, 698 (D.C.Cir.1994). *See generally* John F. Dolan, *The Correspondent Bank in the Letter-of-Credit Transaction,* 109 Banking L.J. 396 (1992) (*"The Correspondent Bank"*). Letters of credit facilitate international transactions by providing for prompt payment by an issuing bank to a beneficiary once the beneficiary complies with the terms of the letter of credit. *See Centrifugal Casting Machine Co., Inc. v. American Bank and Trust Co.,* 966 F.2d 1348, 1352 (10th Cir.1992); *Sound of Market Street v. Continental Bank Int'l,* 819 F.2d 384, 388 (3rd Cir.1987).

■ Letters of credit deal in documents, operating independently from the underlying sales contracts: whether the parties have performed under the contract is irrelevant to the obligations of the parties to a letter of credit as long as conforming presentment is made. Uniform Customs and Practice for Documentary Credits (1983) ("1983 UCP"), at Art. 3; U.C.C. § 5–114(1); *see Centrifugal Casting,* 966 F.2d at 1352; John F. Dolan, The Law of Letters of Credit ¶ 6.01, at 6–1 & ¶ 4.03(6)[a], at 4–14 (2nd ed. 1991). If the beneficiary presents documents that conform to the terms of the letter of credit, the beneficiary is entitled to payment by the issuing bank, 1983 UCP, *supra,* at Art. 10(a); U.C.C. § 5–114(1), as well as from a correspondent bank, if any, that has undertaken an obligation to honor conforming presentment. 1983 UCP, *supra,* at Art. 10(b); *see* U.C.C. § 5–107(2); *Consarc,* 27 F.3d at 698. *See generally* Dolan, The Law of Letters of Credit, *supra,* ¶ 3.03(6), at 3–16 to 3–17.

■ In a standard letter of credit transaction, the issuing bank requests a bank in the country of the shipper or beneficiary to advise the letter of credit, acting as an informa-

tion transmitter. 1983 UCP, at Art. 8; U.C.C. §§ 5–103(1)(e); 5–107; *see* Hawkland & Holland, U.C.C. Series § 5–107:02, at 79 (Art. 5) (1993 & 1995 Cum.Supp.). *See generally* Dolan, *The Correspondent Bank, supra.* The issuing bank may also request that a bank serve as a correspondent reimbursing bank, authorized to pay under the letter of credit. 1983 UCP, at Arts. 11(b) & 21(a). However, unless the issuing bank has requested, and the correspondent has given, an irrevocable undertaking to do so, the payment is not on a confirmed basis. 1983 UCP, at Arts. 10(b) & 11(c); *see* U.C.C. § 5–107; Art. 5(a), U.S. Guidelines and Procedures Governing Bank-to-Bank Reimbursements Under Letters of Credit ("Bank-to-Bank Reimbursement Guidelines"), attached to Bergerco's Motion for Summary Judgment, at Appendix B; Dolan, Letters of Credit, *supra,* ¶ 8.01[7][a], at 8–16. *See generally* Dolan, *The Correspondent Bank, supra.*

■ Whether a bank is a confirming bank or a reimbursing bank is a question of intent as expressed in the letter of credit. *See Barclays Bank v. Mercantile National Bank,* 481 F.2d 1224, 1233, *reh'g en banc denied,* 481 F.2d 1403 (5th Cir.1973), *cert. dismissed,* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974). A confirming bank, as a primary obligor, plays a more prominent role in a letter of credit transaction than the adviser or reimbursing bank. *See* Dolan, *The Correspondent Bank, supra.* In a confirmed reimbursement credit, the confirming bank, familiar with the credit worthiness of the foreign issuing bank, agrees to make payment from its own funds or from the issuing bank's pledged funds on account with the confirming bank upon a proper request to the correspondent or based upon instructions from the issuing bank. UCP, at Art. 10(b); U.C.C. § 5–107. *See Consarc,* 27 F.3d at 698.

■ In this case, New York law provides the applicable substantive law. *E.g., Alaska Textile v. Chase Manhattan,* 982 F.2d 813, 816–17 (2nd Cir.1992). Under Article 5 of the N.Y.U.C.C. (McKinney 1991),[5] the UCP

---

5. N.Y.U.C.C. § 5–102(4) provides: "Unless otherwise agreed, this Article 5 does not apply to a letter of credit or a credit if by its terms or by agreement, course of dealing or usage of trade

such letter of credit or credit is subject in whole or in part to the Uniform Customs and Practice for Commercial Documentary Credits fixed by

controls, *see Sound of Market Street*, 819 F.2d at 387; *Semetex Corp. v. UBAF Arab American Bank*, 853 F.Supp. 759, 769 (S.D.N.Y.1994), *aff'd* 51 F.3d 13 (2nd Cir. 1995), because Rasheed Bank's Letter of Credit provides that the letter is subject to the 1983 UCP. *See* Letter of Credit, at 1, Coles Decl., at Exhibit 18.

### Bergerco's Claim Under Rasheed Bank's Letter of Credit.

■ In the instant matter, Rasheed Bank, as the bank issuing the letter of credit, substituted its credit for that of the account party, Iraqi State Company. Rasheed Bank was therefore required to honor Bergerco's demand for payment as long as the documents presented by Bergerco conformed with the terms of the Letter of Credit.[6] 1983 UCP, at Art. 10(a); *see* U.C.C. § 5–114. As the advising bank, RBC's role was to advise Bergerco of the establishment of the Letter of Credit and to transmit the required documents to Rasheed Bank for examination prior to their acceptance.[7] 1983 UCP, at Art. 8; *see* U.C.C. §§ 5–103(1)(e), 5–107(1). The Letter of Credit authorized RBC to pay Bergerco directly and request reimbursement from BNY,[8] which had been nominated by Rasheed Bank as a correspondent reimbursing (paying) bank. 1983 UCP, at Art. 2(ii) & Art. 11(b). As a reimbursing bank on an unconfirmed basis, BNY was authorized to pay reimbursement claims in accordance with the Letter of Credit, *see* BNY Motion for Summary Judgment, Affidavit of Constance L. Thatcher, at ¶¶ 6–8, but was not required to do so as a confirming bank. 1983 UCP, at Arts. 10(b) & 11(c); *see* U.C.C. § 5–107(2); Bank-to-Bank Reimbursement Guidelines, *supra*, at Art. 5(a). Unlike Rafidain Bank's request in *Consarc*, 27 F.3d at 698, Rasheed Bank never requested that BNY confirm the credit. *Compare* 1983 UCP, Art. 2(ii) & Art. 11(b) *with* 1983 UCP, at Art. 10(b) *and Con-*

---

the Thirteenth or by any subsequent Congress of the International Chamber of Commerce."

**6.** To receive payment, the Letter of Credit, in relevant part (with the typographical errors as contained in the original), required:

> 1–DOCUMENTS REQUIRED
> A) BENEFICIARIES SIGNED COMMERCIAL INVOICES IN ORIGINAL AND 18 COPIES THE NAME OF THE BUYER STATING THE MERCHANDISE DESCRIPTION QUANTITY PRICE VALUE NET AND GROSS WEIGHT FREIGHT CHARGES SHIPPING MARKS COUNTRY OF ORIGIN COUNTRY OF MANUFACTURES TRADE DISCOUNT (IF ANY) AND CERTIFYING ITS CORRECTNESS AND THAT THE GOODS ARE OF CANADA ORIGIN, IF THE GOODS ARE INVOICED ON INCLUSIVE OF O & F DETAILS OF CHARGES AND EXPENSES ARE NOT NECESSARY PROVIDED THAT THE ARE STATED TO BE INCLUDED,
> B) CERTIFICATE OF ORIGIN AND PACKING LIST.
> C) DOCUMENTS MARKED (X) BELOW:
> (X) FULL SET OF SHIPPING COMPANY'S (ON BOARD) THROUGH B/L MARKED FREIGHT PREPAID MADE OUT TO THE ORDER OF OUR BANK MARKED NOTIFY BUYERS AND CLAUSED THAT THE CARRYING VESSELS IS NOT SCHEDULED TO CALL AT AN ISRAELI PORT OR BY ANY OTHER EVIDENCE TO THAT EFFE ALSO CERTIFYING THAT THE CARRYING VESSELS IS NOT INCLUDED IN THE IRAQI GOVERNMENT BLACK LIST A CERTIFI-CATE SIGNED BY THE SHIPPING COMPANY OR AGENT TO THIS EFFECT IN LIEU OF THIS CLAUSE IS ACCEPTABLE. B/L IS NOT ACCEPTABLE IF:
> 1–CONTAINING A PROVISION THAT THE GOODS MAY BE CARRIED ON DECK,
> 2–BEARING REFERENCE BY STAMP OR OTHERWISE TO COST ADDITIONAL TO FREIGHT CHARGES
> 3–GOODS ARE NOT ALLOWED TO BE SHIPPED ON BOARD OF VESSELS CARRYING IRANIAN GOODS.
> THIS CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTRY CREDIT NO. 1988 REVISION INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO:—400.
> Coles Decl., at Exhibit 18.

**7.** Paragraph 14 of the Letter of Credit, in relevant part, provides:

> PLEASE FORWARD THE ORIGINAL SET OF THE SHIPPING DOCUMENTS TO US BY REGISTERED AIRMAIL, CONFIRMING THAT THE CREDIT TERMS HAVE BEEN COMPLIED WITH, THE DUPLICATE SET BY NEX (sic) REGISTERED AIRMAIL.
> Coles Decl., at Exhibit 18.

**8.** Paragraph 13 of the Letter of Credit provides:

> IN REIMBURSEMENT OF YOUR PAYMENT, AGAINST DOCUMENTS IN CONFORMITY WITH THE TERMS OF THIS L/C, DRAW ON OUR ACCOUNT WITH: THE BANK OF NEW YORK, NEW YORK, U.S.A. UNDER ADVICE.

*sarc*, 27 F.3d at 698; *see also* U.C.C. § 5–107(2). Consequently, BNY's correspondent role was merely that of a reimbursing bank: it was authorized to pay RBC's reimbursement request, but it did not confirm the Letter of Credit by acting as a primary obligor, agreeing to substitute its credit for that of Rasheed Bank and accepting the concomitant obligation to pay.

Bergerco contends that it is entitled to payment of the funds in Rasheed Bank's account at BNY, because it made conforming presentment to Rasheed Bank prior to August 2, 1990. According to this argument, the conforming presentment to Rasheed Bank divested Iraq of any property interest in Rasheed Bank's funds before the freeze took effect. Bergerco also argues that it is entitled to reimbursement from BNY because RBC requested reimbursement from BNY on July 11, 1990, the day after Rasheed Bank accepted Bergerco's conforming presentment from RBC. Because there are no genuine issues regarding any material facts, summary judgment is appropriate and will be entered in favor of BNY.

■ It is uncontested that RBC forwarded the required shipping documents to Rasheed Bank on July 10, 1990, and that Rasheed Bank accepted the documents as conforming presentment. By accepting conforming presentment in accordance with the Letter of Credit, Rasheed Bank immediately owed Bergerco the full contract amount, which obligation is reflected in the default judgment awarded by this Court.[9] *See Bergerco Canada v. Iraqi State Company for Food Stuff Trading, et al.*, Memorandum Opinion, Order and Judgment, Civ. A. No. 92–2781 (D.D.C.,

July 26, 1994). The contested issue presented here is not whether Bergerco is entitled to payment of the moneys due, but whether Bergerco is entitled to the specific assets in Rasheed Bank's account at BNY. Resolution of this issue turns simply upon whether Iraq had an interest in the funds when President Bush issued Executive Order 12722, freezing all Iraqi assets in the United States.

Rasheed Bank accepted presentment under the terms of the Letter of Credit. However, as Bergerco admits, Rasheed Bank did not release sufficient funds promptly from its account at BNY to pay Bergerco. Coles Decl., at ¶ 36.[10] Based upon the evidence offered by Bergerco, Rasheed Bank did not instruct BNY to honor Bergerco's claim until September 4, 1990. *Id.* at ¶ 39 (citing Exhibit 32). While BNY contends that it was not notified of such authorization until September 21, 1990, the difference between the two dates is not material and thus, does not preclude summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Because both September 4th and September 21st were after the promulgation of Executive Order 12722, Rasheed Bank's funds were subject to the blocking order, unless Iraq's interest was divested earlier by some other mechanism.

■ Faced with this reality, Bergerco contends in the alternative that RBC made a reimbursement request to BNY on July 11, 1990, which request was sufficient to divest Iraq of its interest in the funds. This argument is also unpersuasive.

Based upon the fax transmission that it received from RBC, Bergerco avers that

Coles Decl., at Exhibit 18.

9. Bergerco undercuts its principal argument that Iraq has no interest in the frozen assets, by arguing that it may enforce the default judgment against the account at BNY. In its papers, Bergerco contends that it is "entitled by the Court's July 26, 1994 judgment against Rasheed [Bank] to an order requiring BNY to turnover (sic) funds from Rasheed's Bank account to pay Bergerco's judgment." Plaintiff's Memorandum of Law in Opposition to Defendant Bank of New York's Motion for Summary Judgment, at 8. While Bergerco argues that it is entitled to satisfaction of the judgment from Rasheed Bank's account at BNY, Bergerco could only enforce this default

judgment against Iraqi government entities if such entities maintained an interest in the frozen assets. However, if Iraq has an interest in the property and OFAC's regulations are valid, *see infra*, the funds are properly frozen and unavailable to Bergerco unless it obtains a license from OFAC.

10. Bergerco presents evidence that Iraq made sufficient funds available by July 30, 1990, but there is no evidence that Rasheed Bank pledged the funds as did Rafidain Bank in *Consarc*. *Compare* Coles Decl., at ¶¶ 38–39 (funds released and available) *with Consarc*, 27 F.3d at 698 (funds blocked or pledged) *and* Thatcher Affida-

RBC requested timely reimbursement from BNY. The substance of RBC's fax, authored by S. Games, stated:

> Today we learned from DHL that envelope containing ship. docs. were (sic) delivered to the subject bank [Rasheed] on July 10–1990 and receipt signed by Iman Abdul Rasul.
>
> Yesterday, July 11/90 we telexed correspondent [BNY] *requesting status and date* when we may expect payment.
>
> We shall keep you informed of developments.

RBC fax of July 12, 1990 authored by S. Games, attached to Coles Decl., at Exhibit 28 (emphasis added).

Bergerco's contention that RBC claimed reimbursement from BNY rests solely on an implication from the hearsay contained in this fax transmission. The difficulty here is that Bergerco has not offered evidence sufficient to withstand BNY's motion for summary judgment as is required under Rule 56(e) of the Federal Rules of Civil Procedure. In claiming that RBC made a reimbursement request, *Bergerco has nevertheless failed to support its claim with any of the evidentiary materials expressly listed in Rule 56(c)* or other evidence that would be admissible at trial and appropriate for consideration by the court in ruling on a summary judgment motion. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553; 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, at § 2721, at 40; *id.* at § 2724, at 73. Bergerco has not provided an affidavit from S. Games, who purports to have some knowledge about the fax. *See Semetex Corp.*, 853 F.Supp. at 765

n. 4 (triable issue raised on whether presentment had been accepted by bank where acceptance disputed through depositions and affidavits). Bergerco has not offered an affidavit from the sender, the authorizer nor anyone else at RBC with personal knowledge of the telex or its transmission. Nor did Bergerco provide the Court a copy of the telex itself. Instead, Bergerco offers only the inadmissible hearsay contained within RBC's fax to Bergerco, which meekly (and ambiguously) states that it asked BNY for a status report and when payment might be expected. Discovery is closed and Bergerco's choice of evidentiary material makes clear that there is no genuine issue for trial.

On the other hand, the admissible evidence cuts against Bergerco. Bergerco Vice President Marcus Cole stated in his affidavit that RBC relayed, on September 21, 1990, Rasheed Bank's instructions of September 4, 1990, directing BNY to reimburse Bergerco via RBC. *See* Decl. of Marcus Coles, ¶ 39 & Exhibit 32.[11] These instructions were issued, and relayed, well after Iraq's were frozen on August 2, 1990.[12]

In sum, Bergerco has not presented evidentiary material sufficient to establish the existence of a genuine issue of material fact that, prior to the effective date of Executive Order 12722, RBC requested reimbursement from BNY under the terms of Rasheed Bank's Letter of Credit. Even accepting *arguendo* that RBC had submitted a proper and timely request, BNY was under no obligation to reimburse RBC as a matter of law. BNY was simply not a confirming bank. *See* 1983 UCP, at Arts. 10(b) & 11(c);[13] *see also*

---

vit, at ¶¶ 13–19 (Rasheed Bank's funds not blocked or pledged with BNY).

11. Exhibit 32 to the Coles Declaration is a telex sent to BNY from advising bank RBC on September 21, 1990, which provides, in relevant part:
THE FOLLOWING IS A COPY OF A MESSAGE SENT TO YOUR REIMBURSEMENT DEPARTMENT.
NEGOTIATED DOCUMENTS FOR USD1,964,016.94 DRAWN UNDER L/C 4659/106 ISSUED BY RASHEED BANK, BAGHDAD, IRAQ. KINDLY CREDIT USD1,964,016.94 TO OUR TORONTO A/C NBR 218-715-1 WITH OUR NY OFFICE QUOTING MANITOABA INTERNATIONAL TRADE CENTRE REF WE 3150.

THIS REIMBURSEMENT CLAIM IS EFFECTED ON THE STRENGTH OF A TESTED TELEX AUTHORITY DATED SEPT 4/90 RECEIVED FROM RASHEED BANK, BAGHDAD.

12. Although unimportant in resolving the cross-motions for summary judgment, Bergerco never explains why Rasheed Bank's directive of September 4th was necessary if RBC had tendered an adequate reimbursement request to BNY on July 11, 1990.

13. Article 10(b) provides, in relevant part:
When an issuing bank authorizes or requests another bank to confirm its irrevocable credit and the latter has added its confirmation,

Bank-to-Bank Reimbursement Guidelines, at Art. 5(a);[14] 1993 UCP, Liability of Issuing and Confirming Banks, at Art. 9;[15] Unofficial Comments to Article 9, 1993 UCP, *reprinted in* Dolan, Letters of Credit, at SA–14 (1995 Cum.Supp. No. 2).[16] Moreover, while the funds sought were available by July 30, 1990, *see* Coles Decl., at ¶ 39, Rasheed Bank did not pledge those funds to satisfy its obligations under the Letter of Credit. *Compare Consarc,* 27 F.3d at 698 ("To induce BNY to make the commitment [to act as a confirming bank], Rafidain "blocked" (or pledged) $6.4 million from an account it held at BNY."). Any time prior to payment by BNY, Rasheed Bank retained every right to transfer the funds from its account. Unless and until the funds were transferred, Rasheed Bank's interest remained not only viable, but paramount.

■ Because the funds were not transferred to RBC and because BNY incurred no obligations as a confirming bank to disburse its own funds or funds from a pledged account, BNY incurred no legal obligation to pay RBC on behalf of the Letter of Credit's beneficiary, Plaintiff Bergerco. Consequently, even if RBC had made a proper reimbursement request to BNY on July 11, 1990, it is difficult to understand how such a request would have magically divested Iraq of its interest in Rasheed Bank's account where BNY was acting on an unconfirmed basis. Had BNY released the funds to RBC prior to August 2, 1990, there is little question that

Iraq would have been divested of its interest prior to the freeze. However, BNY did not do so and, under the applicable law, it was not obligated to do so. After August 2, 1990, and over a month before Rasheed Bank directed disbursement, the President issued Executive Order No. 12722. When RBC sought reimbursement on September 21, 1990, BNY properly complied with that executive order, stating that: "Due to an Executive Order Issued by the President of the United States, we are unable to process your transaction at this time." BNY telex to RBC (Sept. 24, 1990), attached to Coles Decl., at Exhibit 33.[17]

■ The authority upon which Bergerco relies is unhelpful to its argument, because those cases involve confirming banks, not reimbursing banks on an unconfirmed basis. In *Consarc,* Rafidain Bank had requested that BNY confirm the credit and, to induce BNY to do so, pledged $6.4 million in its account to satisfy its obligations under the letter of credit. 27 F.3d at 698. Until Consarc made conforming presentment under the letter of credit, Iraq retained a reversionary interest in the funds. Because Consarc failed to do so prior to August 2, 1990, the funds were subject to the blocking order under E.O. 12722. Here, Bergerco's problem is not with the conforming presentment, but with respect to the lack of a confirmed credit or a pledged account. Contrary to Bergerco's wish, *Consarc* does not stand for

---

**14.** Paragraph 5(a) provides:

A Reimbursing Bank is not obligated to honor claims made under a Reimbursement Authorization unless, and to the extent that, at the request of the Issuing Bank, it has given its irrevocable undertaking to a nominated Claiming Bank that the latter's claim will be honored.

such confirmation constitutes a definite undertaking of such bank (the confirming bank), in addition to that of the issuing bank, provided that the stipulated documents are presented and that the terms and conditions of the credit are complied with....

Article 11(c) provides:

Unless the nominated bank is the issuing bank or the confirming bank, its nomination by the issuing bank does not constitute any undertaking by the nominated bank to pay, to accept, or to negotiate.

**15.** In relevant part, Article 9 provides that "[a]n irrevocable Credit constitutes a definite undertaking of the Issuing Bank, provided that the stipulated documents are presented to the Nominated Bank or to the Issuing Bank and that terms and conditions of the Credit are complied with...."

**16.** "In many cases, the nominated bank will not be a confirming bank and will have no obligation toward the beneficiary to satisfy the credit obligation."

**17.** Bergerco claims that BNY's notice was not sufficient to communicate that it was dishonoring the claim. It is difficult to understand what more BNY should have said. In any event, the notice comports with Article 6 of the Bank-to-Bank Reimbursement Guidelines, *supra,* because it communicated that it could not honor the claim because of the Executive Order. Bergerco cites no binding authority to the contrary.

the broad proposition that conforming presentment automatically divests an issuing bank of its interest in a general account at a correspondent bank. Bergerco is a general creditor with a default judgment against Rasheed Bank and Iraqi State Company. While Bergerco has a legal claim against Rasheed Bank and Iraqi State Company, absent pledged funds in Rasheed Bank's account or a confirmed credit by BNY, conforming presentment alone did not transfer Iraq's interest in specific assets to Bergerco.

The other cases upon which Bergerco relies are similarly distinguished. In *Centrifugal Casting,* the Court of Appeals for the Tenth Circuit held Iraq had no interest in funds paid to the plaintiff by the *confirming* bank, Banco Nazionale del Lavora ("BNL"). 966 F.2d at 1353. The *Centrifugal Casting* plaintiff entered into a contract with an Iraqi government agency to provide cast ductile iron pipe. *Id.* at 1349. Payment was to be made through an irrevocable letter of credit confirmed by BNL. *Id.* at 1350. Under the terms of the letter of credit, before completing performance under the contract but prior to August 2, 1990, the plaintiff withdrew a down payment of $2.7 million, which became the focus of the litigation once Iraq invaded Kuwait and the President issued E.O. 12722. *Id.* The United States intervened in the litigation, contending that Iraq had an interest in the $2.7 million drawn under the letter of credit, because Iraq could assert a breach of contract claim against the plaintiff. *Id.*

The *Centrifugal Casting* court rejected the government's argument, relying on the nature and operation of international letters of credit. *Id.* at 1353. The court cited a number of reasons, all of which support the result reached here. First, unlike this case involving Rasheed Bank's Letter of Credit, prior to August 2, 1990, payment was actually made to the beneficiary of the letter of credit. Moreover, the payment was made by a confirming bank that had agreed to substitute its credit for that of the Iraqi bank. Second, Iraq's interest was speculative: the court dismissed the proposition that prior to the commencement of litigation the United States could assert, on behalf of Iraq, a *potential* breach of contract claim that Iraq

had never asserted itself. *Id.* Finally, the court noted that a contrary ruling would "defeat the principle of independence universally recognized by the courts as crucial to the letter of credit's integrity as a financing device." *Id.*

The principles of letter of credit law upon which the *Centrifugal Casting* court relied are the same principles applicable here. Those principles command a different result in this case, however, because the facts are different. If BNY had confirmed the letter of credit and paid Bergerco (via RBC) prior to August 2, 1990, as did BNL, Iraq would no longer have had an interest in the funds in its account. *See Centrifugal Casting,* 966 F.2d at 1353. Similarly, if BNY had agreed to confirm the credit pursuant to Rasheed Bank's request and if Rasheed Bank had pledged the funds in its account at BNY to satisfy the obligations of the credit, Iraq would have had no viable interest as of August 2, 1990. *See Consarc,* 27 F.3d at 698 & 702.

While Bergerco suggests that the lack of a confirmed credit is a red herring, the obligations of a correspondent bank that has confirmed a letter of credit under the UCP are substantially different from those of a bank that merely agrees to reimburse requests made pursuant to a letter of credit. The fact that the letters of credit were confirmed was central to the principal cases upon which Bergerco relies for support. *See Consarc,* 27 F.3d at 698 (BNY agreed in a confirmed reimbursement credit to pay beneficiary out of pledged account); *Centrifugal Casting,* 966 F.2d 1348 (payment made by a confirming bank); *Semetex Corp.,* 853 F.Supp. at 770 ("the issuing or confirming bank must honor a proper demand even though the beneficiary has breached the underlying contract") (citing *Centrifugal Casting,* 966 F.2d at 1352); *Engel Industries v. First American Bank,* 803 F.Supp. 426, 428 (D.D.C.1992) (confirming bank obligated to pay, because beneficiary is entitled to benefit where it has arranged for a confirmed letter of credit).

Bergerco also attempts to rely upon cases in which an issuing bank was held to the terms of its letter of credit or the UCP.

*E.g., Alaska Textile v. Chase Manhattan Bank,* 982 F.2d 813 (2nd Cir.1992) (issuing bank sued for wrongful dishonor); *Bank of Cochin v. Manufacturers Hanover Trust Co.,* 808 F.2d 209 (2nd Cir.1986) (issuing bank estopped by failing to advise the confirming bank of reasons that documents were non-conforming); *Kuntal, S.A. v. The Bank of New York,* 703 F.Supp. 312 (S.D.N.Y.1989) (issuing bank waived rights to claim discrepancies due to delay); *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975) (issuing bank liable for breach by directing reimbursement bank not to pay beneficiary under letter of credit). These holdings are fully consistent with the UCP and, while such holdings may apply equally to correspondent banks that have confirmed an irrevocable credit, *see* UCP, at Art. 10(b), they do not provide Bergerco with the support it seeks when the correspondent bank is not also a confirming bank. *See id.* at Art. 11(c).

 It is well established in the law that "[a] letter of credit remains wholly executory until the beneficiary complies with its terms." *Consarc,* 27 F.3d at 702. Once Bergerco made conforming presentment, Rasheed Bank was obligated to pay according to the terms of the Letter of Credit. *See Union Planters National Bank v. World Energy Systems Assoc.,* 816 F.2d 1092, 1098 (6th Cir.1987). This obligation was reflected in the default judgment that Bergerco obtained in this Court on July 26, 1994. However, the fact of conforming presentment does not, by itself, divest an Iraqi government agency of its interest in unpledged funds in an account at a correspondent bank that has not confirmed the letter of credit.

### OFAC's regulations.

 Having failed to show that Iraq had no interest in Rasheed Bank's account at BNY on August 2, 1990, Bergerco challenges OFAC's regulations, 31 C.F.R. §§ 575.101–575.901 (1995). These regulations are based

on the President's authority in the International Emergency Economic Powers Act ("Emergency Powers Act"), 50 U.S.C. § 1701 *et seq.* (1988 & Supp. V. 1993). OFAC's regulations will withstand Bergerco's attack "unless they contradict express statutory language or prove unreasonable." *Consarc Corp.,* 27 F.3d at 701 (D.C.Cir.1991) (citing *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)).

When Iraq invaded Kuwait on August 2, 1990, President Bush froze "[a]ll property and interests of the Government of Iraq, its agencies, instrumentalities and controlled entities and the Central Bank of Iraq that are in the United States." Executive Order No. 12722, § 1, 55 Fed.Reg. 31803 (1990). Executive Order No. 12722 was superseded on August 9, 1990, by Executive Order No. 12724, which, while implementing a United Nations Security Council Resolution imposing economic sanctions against Iraq, did not change the blocking order. Executive Order No. 12724, 55 Fed.Reg. 33089 (Aug. 9, 1990).

Under the Emergency Powers Act, "the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise ... investigate, regulate, or prohibit ... transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof." 50 U.S.C. § 1702(a)(1)(A)(ii). The Emergency Powers Act authorizes the President to issue implementing regulations.[18] Those regulations include a provision stating that, except as authorized by OFAC, "no property or interests in property of the Government of Iraq ... may be transferred, paid, exported, withdrawn or otherwise dealt in." 31 C.F.R. § 575.201(a). Thus, funds in a blocked account, defined as "any account or property in which the Government of Iraq has an interest," *id.* § 575.301, may not be transferred or withdrawn, *inter alia,* "expect pursuant to an authorization or license from OFAC authorizing such action." *Id.* Property interests

---

**18.** 50 U.S.C. § 1704 provides: "The President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter."

include present, future and contingent interests in letters of credit, bank accounts and deposits. *Id.* § 575.315; *see Consarc*, 27 F.3d at 701. OFAC has limited the effect of amendments to its regulations to be prospective in nature. 31 C.F.R. § 575.402 (1995).[19]

Among OFAC's exemptions is General License 7. As initially implemented, this regulation provided in relevant part that "specific licenses may be issued on a case-by-case basis to permit payment, from a blocked account or otherwise, of amounts owed to or for the benefit of a U.S. person for goods or services exported by a U.S. person or from the United States prior to the effective date of" the blocking order, August 2, 1990. General License No. 7 (Aug. 15, 1990), Attachment 1 to Bergerco's Memorandum at Law, *supra*.

After Bergerco submitted its application for a license, but before a final agency decision was made, OFAC amended General License No. 7. As amended, the regulation provides in relevant part that "[s]pecific licenses may be issued on a case-by-case basis to permit payment involving an irrevocable letter of credit issued or confirmed by a U.S. bank, or a letter of credit reimbursement confirmed by a U.S. bank, from a blocked account or otherwise, of amounts owed to or for the benefit of a person with respect to goods or services exported prior to the effective date" of the blocking order, August 2, 1990. General License No. 7, as amended (Oct. 18, 1990), Attachment B to McDonell Decl; *see also* 31 C.F.R. § 575.510(a) (1991).

On October 2, 1990, OFAC advised Bergerco through ConAgra that its application had been rejected, because Rasheed Bank's letter of credit providing for reimbursement by BNY was on an unconfirmed basis. *See* Waters Decl., at ¶ 11. On November 20, 1990, OFAC issued its final agency decision, which stated in relevant part:

[T]he financing terms of the Bergerco transaction do not meet the provisions of General License No. 7, amended, because your request for payment from BONY rests solely on an unconfirmed reimbursement. Under the terms of such arrangement, no mandatory legal obligation extends to BONY to remit funds to any part to the letter of credit. Absent an identifiable and binding legal undertaking by a U.S. financial institution, [OFAC] will not require or license the remittance of funds by financial institutions authorized to transact business in the United States.

Letter of Nov. 20, 1990, from R. Richard Newcomb, Director, OFAC to Mary Kirtley Waters, Esq., ConAgra, attached to Waters Decl., at Exhibit B.

▆▆ Bergerco attacks both regulations on a number of grounds. First, Bergerco contends that by using the word "any banking institution" in the Emergency Powers Act, *see* 50 U.S.C. § 1702(a)(1)(A)(ii), Congress did not intend for the President, or OFAC, to discriminate between U.S. banks and foreign banks. Bergerco's Memorandum at Law, *supra*, at 10–11. Second, Bergerco argues that OFAC misapplied its regulations and the current case law to the facts presented here. *Id.* at 13–18. In its third argument, Bergerco offers a variety of grounds to attack OFAC and its regulations under the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.* Bergerco claims that OFAC's decision to apply the amended regulation retroactively violated the APA and relevant case law. Additionally, it claims that the decision to deny the specific license was arbitrary and capricious, because Bergerco had met all of the requirements of the unamended General License No. 7 and because the amended regulation's limitation to confirmed letters of credit or reimbursement arrangements is irrational. Finally, Bergerco contends that OFAC did not adequately justify the amendment to General License No. 7 in violation of

---

**19.** 31 C.F.R. § 575.402 provides, in relevant part:

Any amendment, modification, or revocation of any section of this part or of any order, regulation, ruling, instruction, or license issued by or under the direction of the Director of the Of-

fice of Foreign Assets Control shall not, unless otherwise specifically provided, be deemed to affect any act done or omitted to be done, or any civil or criminal suit or proceeding commenced or pending prior to such amendment, modification, or revocation.

the APA.[20] *Id.* at 21–29. In its fourth argument, Bergerco argues that the United States is abusing its regulatory powers to protect its position as a competing, unsecured commercial creditor of Iraq.[21] Of those arguments proffered by Bergerco, the Court rejects all that it reaches, except for the issue of retroactive application of the amended regulation.

■■■ Bergerco's first argument is rejected, because this Court finds General License No. 7, as initially promulgated on August 15, 1990 and as amended in 31 C.F.R. § 575.510(a) (1995), is a reasonable construction of the Emergency Powers Act. In attacking OFAC's regulations as beyond the authority of the Emergency Powers Act, Bergerco essentially contends that "any banking institution" means "every banking institution." Under Bergerco's argument, every banking institution, foreign and domestic, must be treated similarly. This interpretation is far from obvious since the word "any" does not equate to the word "every." Had Congress intended that the President apply its regulations similarly to every banking institution, foreign and domestic, it surely could have said so.

That Bergerco's interpretation is implausible is even more clear by taking a closer look at what Bergerco's argument would mean in this case. By accepting Bergerco's argument that "any" means "all," Rasheed Bank's unconfirmed letter of credit would be entitled to the same treatment as letters of credit issued or confirmed by U.S. banks. This construction would allow Iraq to pay Bergerco for the split peas out of Rasheed Bank's

frozen assets at BNY. However, such a result would be completely inconsistent with Congress' intent to block the distribution of funds in which Iraq possessed an interest.

Surely, Congress envisioned that application of the powers under the Act would, in fact, involve discrimination against foreign banks, such as those of Iraq, in order to be effective. General License No. 7 does just that. Iraqi assets are frozen, and Rasheed Bank must use different funds to pay its bills. This appears to be precisely the leverage that Congress expected the President to exert. *See Dames & Moore v. Regan,* 453 U.S. 654, 673, 101 S.Ct. 2972, 2983, 69 L.Ed.2d 918 (1981) ("The frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country."); *Propper v. Clark,* 337 U.S. 472, 493, 69 S.Ct. 1333, 1345, 93 L.Ed. 1480 (1949) (blocking orders "put control of foreign assets in the hands of the President"). As initially promulgated or as amended, General License No. 7 appears to fulfill, not contradict, congressional intent. In any event, the regulations neither contradict the express statutory language of the Emergency Powers Act nor do they constitute an unreasonable construction of the statute.

■■■ Second, Bergerco argues that General License No. 7 undermines the international letter of credit and that OFAC misapplied the relevant case law to the facts of its case.[22] Bergerco's argument here rests on the proposition that there is no difference between a confirmed letter of credit and an unconfirmed letter of credit. The Court cannot accept Bergerco's argument, because the

---

**20.** The Court today does not reach this argument.

**21.** Through this argument, Bergerco appears to be asking the Court to referee a policy dispute between a foreign corporation and the United States, which Bergerco casts as a competing general creditor. Bergerco asks the Court to cast judgment on the policy decisions of competing branches. Bergerco's offer will not be accepted. The Court's role under Article III is to construe and apply the law to the facts of a specific case or controversy; its role is not one of policymaking, but of interpreting Acts of Congress as implemented by the President and executive agencies.

**22.** Central to Bergerco's argument is the proposition that Iraq had no interest in the funds in Rasheed Bank's account at BNY after July 10, 1990, because Bergerco had made conforming presentment. As discussed, and rejected *supra,* this argument is without merit. While Rasheed Bank became obligated to Bergerco under the Letter of Credit once RBC made conforming presentment on behalf of Bergerco (as recognized in the default judgment obtained in this Court), conforming presentment did not operate to divest (and transfer to Bergerco) Rasheed Bank's interest in the funds at BNY, because Rasheed Bank did not pledge the funds for that purpose nor did BNY confirm the underlying letter of credit. *See supra.*

distinction carries significant importance. Letter of Credit law makes this distinction persuasive, if not binding: by confirming a letter of credit, a bank substitutes its credit for that of the issuing bank. Bergerco did not negotiate for a confirmed letter of credit here, and it is this fact that undermines Bergerco's argument. *See supra.* Had BNY agreed to confirm Rasheed Bank's irrevocable letter of credit (most likely in exchange for Rasheed Bank's agreement to pledge the funds in its account), Bergerco would have a compelling argument (as did Consarc Corporation). However, that is not what transpired. The cases upon which Bergerco would rely do not help its argument, because those cases involved confirmed letters of credit. If OFAC, in applying its regulations, were to make no distinction between unconfirmed and confirmed letters of credit, a strong argument could be made that the regulations undermine the law of the international letter of credit. As promulgated in at least its amended regulation, however, the distinction is preserved.

■ Finally, Bergerco claims that the amended regulation should not have been retroactively applied; that Bergerco satisfied the regulatory requirements of the initial General License No. 7; that it is therefore entitled to a license under those regulations; and that OFAC's decision to deny the application under the amended regulation was arbitrary and capricious. One aspect of Bergerco's argument is persuasive and dispositive at this stage.[23]

Bergerco's challenge is raised under the APA. OFAC's decision will reviewed and overturned only if it is found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706 (1994).

■ Because the amended regulation should not have been retroactively applied to an application submitted while the August 15, 1990 rules were in effect, OFAC's decision to apply the amended regulations retroactively is not in accordance with the law. *See* 5

U.S.C. § 551(4) (1994) (rules under APA have a future effect); *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988); *id.* at 216–17, 109 S.Ct. at 476 (Scalia, J., concurring); *General Motors Corp. v. Nat'l Highway Traffic Safety Admin.,* 898 F.2d 165, 169 (D.C.Cir.1990). Absent a statutory grant of authority, agencies have no power to promulgate rules with a retroactive effect. *Bowen,* 488 U.S. at 208, 109 S.Ct. at 472. OFAC has pointed to no such authority in the Emergency Powers Act and this Court is aware of none based on an independent review. *Compare Cernuda v. Heavey,* 720 F.Supp. 1544, 1553 (S.D.Fla.1989) (text of 1988 amendments to Trading With the Enemy Act evidences Congress' intent that change be retroactive). The section of the Act granting the President authority to promulgate regulations provides no explicit authority to impose retroactive rules regarding licenses, *see supra* note 18, and it is unclear why such retroactive rule changes would be necessary to fulfill the statutory purpose. Moreover, although promulgated after the 1990 amendment to General License No. 7, it appears that OFAC's own regulations limit their retroactive effect. *See* 31 C.F.R. § 575.402 (1991).

■ OFAC has the authority to issue specific licenses with a retroactive effect in order to effectuate the purposes of the Emergency Powers Act, 50 U.S.C. § 1702(a)(1)(B). *See* 31 C.F.R. § 575.501 (1995); *National Oil Corp. v. Libyan Sun Oil Co.,* 733 F.Supp. 800, 808–09 (D.Del. 1990). Recognizing this authority is not the same as saying it has the authority to change retroactively the rules under which those specific licenses are issued. OFAC appears to recognize its limits. *See* 31 C.F.R. § 575.402 (1995).

OFAC contends in opposition that the amended rule is not retroactive, because, it argues, a rule is retroactive only if it impairs or takes away a vested right. *See* OFAC's Opposition to Plaintiff's Motion for Summary Judgment and Reply on its Own Motion for

---

**23.** Because of the result in this opinion, the Court does not reach Bergerco's alternative APA arguments.

Summary Judgment ("OFAC's Opposition"), at 8–9 (citing *Association of Accredited Cosmetology v. Alexander*, 979 F.2d 859, 864 (D.C.Cir.1992), *vacated in part*, 1 F.3d 45, 1993 WL 280377 (1993) (table)). However, OFAC's reliance upon *Alexander* for such a broad proposition is misplaced. The *Alexander* court held that the plaintiff had no vested right in *future* participation in the Government Student Loan program. *See id.* at 864 (an expectation of future eligibility does not create a vested right). While *Alexander* involved applying new rules to past conduct to determine future entitlement, this matter involves applying new rules to past conduct to determine monetary entitlement arising from that past conduct. This distinction is not insignificant. Moreover, OFAC has failed to mention that the *Alexander* court expressly relied upon, and even quoted, longstanding case law which stated that retroactive laws include those laws attaching "a new disability in respect to transactions or considerations already past." 979 F.2d at 864 ((quoting *Neild v. District of Columbia*, 110 F.2d 246, 254 (D.C.Cir.1940) (quoting *Society for Propagation of the Gospel*, 22 F.Cas. 756, 767 (C.C.D.N.H.1814) (Story, J.)))). The amended regulation was applied retroactively. ConAgra applied for a specific license on behalf of Bergerco under OFAC's regulation of August 15, 1990, and it is entitled to have its application reviewed under those criteria.

■ The Court rejects OFAC's contention that Bergerco lacks standing to raise this issue. Because the regulations implemented on October 18, 1990 may reasonably be construed to have attached a new disability for Bergerco's prior conduct, Bergerco has demonstrated a potential injury that is neither speculative nor hypothetical, and it has, therefore, met its burden to demonstrate standing. *The Freedom Republicans v. Federal Election Comm'n*, 13 F.3d 412, 415 (D.C.Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 84, 130 L.Ed.2d 36 (1994). *See generally* Bernard Schwartz, Administrative Law § 8.12, at 496–97 & n. 8 (3rd ed. 1991) ("courts generally hold that one who has a right to be heard before the agency has standing to seek review") (citing cases, including *Martin Trigona v. Federal Reserve Bd.*, 509 F.2d 363, 366 (D.C.Cir.1975)).

■ In part a component of its standing argument, OFAC argues that Bergerco would not have obtained a license under the old regulations. Bergerco counters that General License No. 7 compels the issuance of a license if the export occurred prior to August 2, 1990, the effective date of the freeze. The old regulation, however, does not clearly support either view. In addition to establishing other prerequisites, the original General License No. 7 reads that a specific license "*may be issued on a case-by-case basis* ... where the exporter's license application presents evidence satisfactory to [OFAC] that ... the exportation occurred prior to the effective date." General License No. 7, at ¶ (a)(1) (Aug. 15, 1990) (emphasis added). As OFAC argues, the grant of a license appears to be discretionary. The requirement that the export occur prior to August 2, 1990, appears to be a necessary but insufficient condition upon which to obtain a license. It is not clear whether Bergerco would have satisfied the additional prerequisites.

To obtain a specific license under the original regulation, the amount must "be owed to or for the benefit of a U.S. person for goods or services exported by a U.S. person or from the United States." General License No. 7, at 1 (Aug. 15, 1990). It is clear that the split peas were exported from Canada, therefore, the definition of "U.S. person" controls ConAgra's application on behalf of Bergerco. The license defines that term:

> The term "U.S. person" shall mean any United States, permanent resident alien, juridical person organized under the laws of the United States (including foreign branches), or any person in the United States, and vessels of U.S. registration.

General License No. 7, at ¶ (e)(1) (Aug. 15, 1990).

Even accepting *arguendo* that the amount owed was for the benefit of Bergerco U.S. or ConAgra Ltd., presumed to be U.S. persons, the export at issue (split peas from Montreal) was accomplished by Bergerco Canada, a Canadian federal corporation. Bergerco Canada, the plaintiff here, does not appear to fall within the plain text of the definition of

"U.S. person" as outlined in the regulation. However, as noted in its reply memorandum, Bergerco relies upon an internal OFAC memorandum for the proposition that a wholly-owned subsidiary of a U.S. corporation "could" be a U.S. person within the meaning of the license. The internal memorandum, which OFAC offers as one component of the administrative record, provides:

> At this juncture, I have requested that ConAgra clarify the status of the Bank of New York to determine the obligation, if any, that bank may have to make reimbursement in this case. I have also explained that the case does not fall squarely within the four corners of General License 7 because the exportation occurred from Canada. However, the exporter, as a wholly-owned subsidiary of a U.S. corporation, *could* be determined to be a U.S. person pursuant to the General License (and, not mentioned, the draft Final Regulations). ConAgra will also provide the name of its contact at the Bank of New York in order that we may obtain any additional information with respect to the L/C in that bank's possession.

Memorandum for Steven I. Pintner, Chief, OFAC Division of Licensing, from Betsy S. Scott, Licensing Officer (Sept. 21, 1990), at 2, attached to OFAC's Motion for Summary Judgment, at Newcomb Decl., at ¶ 8 (i) & administrative record (emphasis added).

At bottom, the Court has no way to know, save speculation, whether Bergerco would have received a license under the old regulation. The Court has nothing to review, because it has no basis to know whether OFAC would have adopted the view expressed in Ms. Scott's memorandum as part of its final agency decision applying the old regulations or whether OFAC would have rejected Bergerco's application on that basis or on other grounds.

■ OFAC's briefs may properly state what the agency position would have been in applying the standards in the old regulations. The briefs aver that the changes between the two regulations are insignificant and that Bergerco would have been denied a license under either regulation. However, the textual differences between the regulations appear to be more than minor, and counsel's articulation is entitled to no deference. *Bowen*, 488 U.S. at 212, 109 S.Ct. at 474 (relying upon *Investment Company Institute v. Camp*, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.")), and *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency [orders]"); *see also Yakima Valley Cablevision, Inc. v. F.C.C.*, 794 F.2d 737, 747 (D.C.Cir.1986) ("counsel's *post hoc* attempt to recast the nature of the agency's action" is insufficient to satisfy the agency's obligation to justify retroactive rulemaking). Because in this case there was no final agency decision applying the August 15, 1990 regulation to ConAgra's request on behalf of Bergerco, and because the administrative record does not provide a basis for reviewing a decision that was not taken, the Court will remand this matter to OFAC for proceedings consistent with this opinion.

### Conclusion

On August 2, 1990, Iraq's Rasheed Bank retained an interest in the funds in its account at BNY. Those funds are subject to the President's Executive Orders freezing Iraqi assets and to OFAC's implementing regulations, which are a reasonable interpretation of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* However, because OFAC improperly applied the new regulation retroactively, this case is remanded with instructions for the agency to consider ConAgra's application under the General License No. 7 regulations of August 15, 1990. Accordingly, it is

ORDERED that Bergerco's motion for summary judgment is denied in part and granted in part as to Count III; it is

FURTHER ORDERED that Bergerco's motion for summary judgment is granted as to the retroactive application of the regulations of October 18, 1990; it is

FURTHER ORDERED that Bank of New York's motion for summary judgment is granted; and it is

FURTHER ORDERED that OFAC's motion for summary judgment is denied; and it is

FURTHER ORDERED that this matter is remanded to OFAC for proceedings consistent with this opinion.

IT IS SO ORDERED.